IN RE APPLICATION OF IRVIN PAULSON FOR A
PETROLEUM CARRIER CERTIFICATE.
IRVIN PAULSON v. SCHIRMER TRANSPORTATION
COMPANY, INC., AND OTHERS.

81 N. W. (2d) 875.

March 15, 1957—No. 36,921.

*Perry R. Moore, Donald A. Morken,* and *Mackall, Crounse, Moore, Helmey & Palmer,* for appellant Schirmer Transportation Company.

*Gordon Rosenmeier,* for appellant Quickie Transport.

*Leonard Lindquist,* for appellant Dahlen Transport.

*Swore & Wallace,* for respondent.

MURPHY, JUSTICE.

Irvin Paulson of Alexandria, Minnesota, made application to the Railroad and Warehouse Commission for a certificate authorizing his operations as a petroleum carrier. This application was made pursuant to M. S. A. 221.47 which relates to "any person * * * engaged in the business of transporting for hire over the public high-

ways of this state petroleum products in bulk in quantities in excess of 2,000 gallons per load." The territory sought embraced the two pipeline origin points of Alexandria and the Twin Cities and the destination area was 15 counties north, east, and west of Alexandria, Minnesota. The application was denied, but on appeal to the District Court of Douglas County, an order was made granting judgment for the petitioner and vacating and setting aside the commission's order of denial. This case is here on appeal from the judgment of the district court.

A review of the record shows that the applicant, Irvin Paulson, from 1948 to 1954 owned his own equipment, consisting of three tractors and two 7,200-gallon trailers, which equipment he leased to authorized carriers who paid him on a percentage basis. In late 1953, Paulson purchased additional equipment in reliance on continuing one such lease for a year. In March 1954, however, the commission issued a directive prohibiting the percentage basis by which the applicant was paid. Paulson and his principal lessee, Schirmer Transportation Company, could not agree on an approved method of compensation to be computed on a mileage basis and the lease was cancelled. Thereafter, Paulson applied for a certificate to operate in his own right as an authorized carrier.

Eleven bulk jobbers testified in behalf of Paulson, indicating that they liked the service he provided while he was operating as a lessor and that they would do some of their business with him if he were granted the certificate.

The principal protestant, Schirmer Transportation Company, is a carrier presently authorized to serve the same Alexandria area which Paulson wishes to serve. The volume of Schirmer's business is about $1,500,000 per year, Alexandria being only one of the company's terminals. Its president, Mr. Schirmer, testified (1) that his company could not economically maintain its terminal in Alexandria unless it has enough business to maintain the three trucks it now operates there; (2) that the granting of the application would affect Schirmer's ability to maintain their equipment in the Alexandria terminal in good condition since each Schirmer terminal should

carry itself; (3) that Schirmer can maintain safe equipment if the applicant is granted a certificate but it will be done at a loss; (4) that the 26 existing carriers in Alexandria create too much competition even though there has been an increase in the petroleum carrying business in that area; (5) that it would be in the public interest to only have three or four carriers in that area rather than the 26 existing carriers because costs and rates can be lowered if more use can be obtained from each piece of equipment; and finally (6) that it is unknown whether the applicant could actually take any of Schirmer's accounts.

Another protesting carrier also testified that there are "far too many" carriers doing business in Alexandria to have a profitable operation. The protestants also introduced testimony tending to establish that five of the witnesses who testified for the applicant were Shell Oil Company jobbers who, under the terms of their contract with Shell, were not free to change carriers, and that Shell would not be expected to honor the jobbers' request to change if the existing carriers were doing a satisfactory job.

There was testimony from a representative of the bus and truck division of the Railroad and Warehouse Commission to the effect that the result a new permit would have on existing carriers, while not necessarily controlling, is an important element in the commission's determinations as to whether or not an application will "not be contrary to public interest" (§ 221.49) and that it is the commission's policy to deny applications unless it is shown that existing carriers are unwilling or unable to take care of any present or increased needs. It appeared from the testimony that it was the local effect on the protestant's business, rather than the overall state-wide effect, that was controlling in the commission's consideration of the case.

In its findings upon which its order was based the commission noted "Applicant appears to have been a careful and conscientious man who has won the good will of the trade he served, * * *." The findings indicated that the applicant would not be able to hold the Shell company business and noted "Without the business of the Shell

dealers, applicant would have very little prospective business on which to rely," and "could not expect to build up a self-sustaining operation in competition with long-established carriers for a very considerable period of time." The findings also noted that the applicant's current financial statement indicated that "unless he can commence such operations with the expectation of obtaining profitable hauling without delay, he cannot continue to operate." The commission found that "Need was not shown for applicant's services," and that it appeared "that if applicant is to obtain business, it will have to be at the expense of existing carriers." While observing that the Great Lakes Pipeline which brings petroleum products to Alexandria has increased its facilities and that there has been a healthy increase in the use of petroleum products in the State of Minnesota and in the Alexandria destination area, the commission nevertheless stated that "this is not proof that the existing carriers are unable to meet the needs of the public, and there was nothing in the testimony to show that applicant's services were required." The findings concluded "That the granting of the application would reduce the income of the presently authorized carriers and render them less able to furnish the service required under their certificates."

On appeal to the district court further evidence was taken, and on review of the entire record the district court made its order vacating the order of the Railroad and Warehouse Commission and remanding the matter to it for further action pursuant to its judgment. The district court concluded that the commission applied an erroneous rule of law which, in effect, required the applicant to prove public convenience and necessity as required by the Common Carrier Act, § 221.08, rather than the less restrictive rule applicable to petroleum carriers as set forth in § 221.49. The district court further determined that the only evidence to show that the permit would be contrary to the public interest was testimony that profits of one or more existing carriers might be affected to a small extent and that no evidence was presented to reasonably support the findings that the carriers would be less able to render the service required by their certificates or that the public would be adversely affected.

A petroleum carrier is defined by § 221.47 as "any person * * * engaged in the business of transporting for hire over the public highways of this state petroleum products in bulk in quantities in excess of 2,000 gallons per load." Section 221.49 directs the commission to grant the certificate if it finds the evidence established (1) that the petitioner is fit and able to conduct the proposed operation, (2) that the granting of the petition will not result in more than ordinary hazards to the public traveling on the highways or to cities or villages through which the petitioner proposes to operate, and (3) that it will not be contrary to the public interest.

■ This court has frequently considered the function of the district court in reviewing an order of the Railroad and Warehouse Commission. Recently, in State v. Chicago & N. W. Ry. Co. 246 Minn. 403, 405, 75 N. W. (2d) 411, 413, we summarized the relationship as follows:

"The role of the district court in reviewing an order of the commission, as prescribed by the legislature, is to determine whether the order is lawful and reasonable. * * * The role of the Supreme Court is that of determining whether all the evidence presented, including that submitted to the commission as well as that submitted to the district court, reasonably sustains the district court's finding that the order of the commission is lawful and reasonable."

See, also, State v. Duluth, M. & I. Ry. Co. 246 Minn. 383, 391, 75 N. W. (2d) 398, 405.

■ The Petroleum Carrier Act, §§ 221.47 to 221.53, inclusive, was passed in 1947 and has specific application to the business of transporting for hire petroleum products over public highways of the state in quantities in excess of 2,000 gallons per load. The act must be given a reasonable construction so as to ascertain and effectuate the intention of the legislature. §§ 645.08, 645.16; 17 Dunnell, Dig. (3 ed.) §§ 8940 to 8951; 50 Am. Jur., Statutes, § 381.

■ In examining an application for a permit to operate as a petroleum carrier, the commission is required to consider whether or not "the petitioner is fit and able to conduct the proposed operation, * * *." § 221.49. Since the record fully establishes that the

petitioner is trustworthy and reliable and that his equipment is adequate and properly maintained,[1] and since the petitioner seeks to use his equipment in his own right in the same manner he has permitted it to be used by the protestants in the past, it seems to us that the commission should have resolved this point in the applicant's favor.

■ The second requirement the commission must consider is whether or not "the granting of the petition will not result in more than ordinary hazards to the public traveling on the highways

---

[1] In connection with the kind of service the applicant renders, as well as throwing light on the manner in which he maintains his equipment, the following testimony of Harold Matthaie, Shell dealer at Wadena, is of interest:

"Q. Was it through Paulson that you went with them?

"A. Yes, sir. Well, Paulson used to call on me every little while with the purpose in mind of getting me to request my products be shipped by way of Schirmer, and I was dissatisfied with the carrier that was hauling and, after quite a few arguments with the office, why, finally we got it switched.

"Q. I see. And do you have this key arrangement?

"A. I do not, but although—may I elaborate on that, that during the time that Irv' was hauling I was operating alone and was out of town most of the time, so that when he came in, if he didn't find me right there, he would swing down to my house and pick up the key, and he knew the setup real well and he'd just unload.

"Q. Did you trust him to go ahead on that basis?

"A. Absolutely.

"Q. How have you found him, as far as reliability is concerned?

"A. First rate.

"Q. Did he give you daylight delivery as a rule?

"A. As a rule he did, yes, and if he saw that he couldn't get in in daylight he would call me first to see for sure that it was acceptable to come in at night, that I would be there.

"Q. Have you had occasion to observe his equipment and its condition and safety appliances and so forth?

"A. Yes, I have.

"Q. What have you observed about it?

"A. He has always kept it clean and in good condition, and I know that he has had it checked, as far as his motors were concerned, at one of our garages there, and if he thought there was any little thing wrong he didn't waste time, he would have it in there and gone over by a competent mechanic."

or to cities or villages through which the petitioner proposes to operate, \* \* \*." § 221.49. The record indicates that the applicant's safety record is good. In the last five years his equipment has been involved in three minor accidents of the damaged-fender variety, none of them involving personal injuries. There is no contention that he will not be able to secure adequate liability insurance. His financial statement shows a net worth of $18,825, a substantial portion of which is represented by an equity in his equipment. While the financial statement is not impressive, it is sufficient when viewed in the light of the applicant's background for industry and dependability.

■ The third requirement for consideration by the commission in granting an application under § 221.49 is that it "will not be contrary to public interest \* \* \*." It is the meaning of this phrase which represents the core of the dispute before us. It is the contention of the protesting carriers that this term embodies the content of "public convenience and necessity" as used in § 221.08. All motor transportation companies which carry persons or property for hire as common carriers must obtain a certificate declaring that public convenience and necessity require such operation. §§ 221.05, 221.08. Prior to the enactment of §§ 221.47 to 221.49 in 1947, no authorization was necessary to operate as a petroleum carrier. It is the contention of the objectors that the term "not contrary to public interest" relates to all phases of public interest in the subject of transportation and in particular to the transportation involved here and includes within its broad concept the conditions for granting a permit to common carriers under § 221.08.

The applicant on the other hand urges that it is error to require him to make a showing which will comply with the numerous provisions of § 221.08 relating to common carriers. He contends that by § 221.49 the legislature intended a competitive situation that permits free entry into the field by any carrier who is fit and able to conduct petroleum carrying operations in a reasonably safe manner that is not contrary to the public interest. See, Lakusta, *Regulation of Truckers for Hire in California,* 41 Calif. L. Rev. 63, 83, discussing problems of motor carrier regulation.

The meaning of the term "public interest" in § 221.49 must be determined in light of the circumstances surrounding the statute in which it is used. The three cases relied on in the briefs defining public interest cannot control here because the statutes interpreted do not, either in language or content, bear sufficient similarity to the problems in the Petroleum Carrier Act.

The protestants cite Baltimore & O. R. Co. v. United States (S.D. N.Y.) 100 F. Supp. 1002, and Texas v. United States, 292 U. S. 522, 54 S. Ct. 819, 78 L. ed. 1402, both of which relate to the interpretation of Federal statutes regulating railroads and in both of which attempts were made to set aside orders of the Interstate Commerce Commission. In the former, the court, in upholding the validity of an order requiring the railroad to establish joint rates and establish through routes, discussed the scope of public interest in the Interstate Commerce Act. We do not think the concept of "public interest" as applied to the interest the public has in the operation of railroads in such a manner as to furnish efficient service at reasonable rates is valid as applied to the statute under consideration here. In the latter case, the United States Supreme Court indicated that the prime purpose of the statute in question was to secure the avoidance of waste as well as assure adequate service. The dissimilarity of the latter case is readily apparent when it is considered that in the Petroleum Carrier Act the Minnesota legislature did not regard the element of duplication of facilities as a danger to be guarded against since the words "or result in an unnecessary duplication of such transportation facilities" was expressly deleted from the senate bill. Journal of the Senate, 1947, pp. 1027, 2420. These cases have no realistic value in relation to the trucking operations in question.

Clintonville Transfer Line v. Public Service Comm. 258 Wis. 570, 46 N. W. (2d) 741, cited by the applicant, is much closer to our facts. The Wisconsin court reversed an order of the Wisconsin Public Service Commission in which the commission denied the request of a common motor carrier to assign its certificate. The Wisconsin court distinguished between "public convenience and necessity," which must be established to create new or duplicated service, and

a showing of "not against the public interest," which is sufficient to permit assignment. The effect on existing facilities was considered only in relation to public convenience and necessity. The facts of the Clintonville case are not sufficiently similar to the facts of this case to allow us to adopt its reasoning as controlling. It does, however, demonstrate the distinction in the minds of the Wisconsin court between "public convenience and necessity" and the concept "contrary to public interest." The applicant urges here that the petroleum carrier's certificate should be obtainable with the same ease in Minnesota as an assignment of a common carrier's certificate in Wisconsin.

Both the order of the commission and the briefs and arguments of the protestants are directed to considerations relating to the competitive economic aspects of the commission's action. They point to a lack of "need" of an additional permit and the effect such permit might have upon carriers already serving the area. These are valid considerations in passing upon an application for a common carrier permit under § 221.08. The latter statute which relates to common carriers by motor vehicles has been in effect for many years. Considerations of public convenience and necessity and the effect on competitive carriers have a bearing on the determination of whether such permits should be granted. But we do not think that the elements of public convenience and necessity or the effect upon existing carriers as used in the statute relating to common carriers by motor freight should be read into the Petroleum Carrier Act (§§ 221.47 to 221.53). The particular statutes with which we are concerned relate to the narrow field of transportation of petroleum products. By these statutes the legislature has recognized the carriage of petroleum products as a specialized kind of transportation. The term "public interest" as used in these statutes necessarily has reference to the inherently dangerous character of the commodity involved and comprehends the concerns and interests of the public in the handling and carrying of petroleum under conditions which will not be inimical to the public welfare. The term "public interest" has application

to the interests of the public as a whole and not the private interests of competitors.

Without attempting to define the term "contrary to public interest" it may be said that the term, as used in § 221.49, does not comprehend that competition should be prohibited nor does it mean that an application should be denied merely because adequate service already exists in the area involved. There is nothing in the language of the act to warrant the assumption that the legislature intended to create a monopoly so as to prevent the granting of a permit to one who is qualified and equipped to engage in the business and who by experience and reputation has demonstrated his fitness and ability to conduct the business in a manner not harmful to the public interests.

Administrative interpretations are entitled to receive consideration, but they may not conflict with the purpose of the statute and the intent of the legislature. Beck v. Groe, 245 Minn. 28, 43, 70 N. W. (2d) 886, 897; Mattson v. Flynn, 216 Minn. 354, 13 N. W. (2d) 11.

The judgment of the district court is affirmed.