WILSON POINT PROPERTY OWNERS ASSOCIATION ET AL. *v.* THE CONNECTICUT LIGHT AND POWER COMPANY ET AL.

WYNNE, C. J., BALDWIN, DALY, KING and MURPHY, Js.

244

Argued March 7—decided April 15, 1958

*John H. Mountain,* for the appellant (named plaintiff).

*Robert B. Seidman,* for the appellants (plaintiffs Nathan et al.), with whom, on the brief, was *Leon K. Paris,* for the appellant (plaintiff The Harbor View Company).

*Walter F. Torrance* and *Walter F. Torrance, Jr.,* with whom, on the brief, was *Richard J. Smith,* for the appellee (named defendant).

*Louis Weinstein,* assistant attorney general, with whom, on the brief, was *John J. Bracken,* attorney general, for the appellee (defendant public utilities commission).

BALDWIN, J. The plaintiffs Wilson Point Property Owners Association and The Harbor View Company are associations of property owners in Norwalk. They own, and have members who individually own, residential property adjacent to or near Manresa Island in Norwalk. The two individual plaintiffs are property owners similarly situated. On November 24, 1952, the defendant The Connecticut Light and Power Company, hereinafter called the defendant, a corporation chartered by the General Assembly and authorized to generate and sell electric power in this state (11 Spec. Laws 111; 17 id. 833; 18 id. 106), filed with the zoning commission of Norwalk an application pursuant to General Statutes § 5646 requesting approval for the erection of

a steam electric generating plant on Manresa Island. In October, 1952, the defendant had purchased substantial areas of land in the southern part of Norwalk bordering upon Long Island Sound at the entrance to Norwalk harbor. Manresa Island, the southernmost portion of this land, is a peninsula about twenty-five acres in extent, almost completely surrounded by water, extending into the Sound. It is connected with the mainland area owned by the defendant by land flooded in part during high water. Most of the defendant's land, including Manresa Island, is zoned residence B. It is bordered on the north and east by an area zoned residence B and C, and on the west by property zoned for industrial uses. Manresa Island is separated from these two areas, one known as Harbor View and the other as Village Creek, by low marsh land owned by the defendant. Wilson Point, where the properties of the Wilson Point Property Owners Association and its members are located, lies west of Manresa Island and approximately half a mile distant across the waters of Long Island Sound. Harbor View, wherein the properties of The Harbor View Company and its members are located, partly in a residence B and partly in a residence C zone, is north of the defendant's property and is adjacent to that portion which comprises the mainland north of Manresa Island. The southerly portion of the Village Creek area is slightly less than a quarter of a mile from Manresa Island.

The defendant's requirements for power in southwestern Connecticut are presently supplied primarily from a steam generating plant in Devon. The defendant claims that the increased demand for electric power in southwestern Connecticut makes the construction of additional generating facilities

at Manresa Island essential as a matter of public convenience and necessity. The zoning commission of Norwalk, after a hearing, issued an order, effective January 19, 1953, permitting the location of a generating plant on Manresa Island. Certain property owner associations and individual property owners joined with the town of Norwalk in seeking a declaratory judgment in the Superior Court. There the matter was reserved, upon stipulation, to this court, and questions relative to the power and action of the zoning commission were answered. *Jennings* v. *Connecticut Light & Power Co.*, 140 Conn. 650, 103 A.2d 535. Prior to the determination of that case, the plaintiff The Harbor View Company and Charles D. Steurer, Jr., acting pursuant to § 5646, appealed to the public utilities commission. Thereafter, the plaintiffs the Wilson Point Property Owners Association, Neva S. Nathan and William G. Luttge were permitted to intervene. The public utilities commission held a series of hearings de novo, and the members of the commission personally viewed the proposed location by land and water. On October 3, 1956, the commission made its finding and order affirming the order of the Norwalk zoning commission. The plaintiffs appealed from the action of the public utilities commission to the Superior Court. The instant appeal is from the judgment of the court dismissing their appeal.

In *Jennings* v. *Connecticut Light & Power Co.*, supra, 664, the legislative history of General Statutes § 5646 was reviewed, its phraseology examined in detail and its legislative intendment determined. We held (p. 666), in substance, that § 5646 expressed a legislative intent to treat the authority exercised by a local zoning commission over the location of a public utility facility within any city or town as a mat-

ter of public utility regulation rather than zoning and that (p. 669) the zoning commission was to function as a special agency of the state and (p. 670) in that capacity, guided by a combination of the standards of public convenience and necessity and the standards of public health, safety and welfare and the stabilization of property values, was required to weigh considerations of public convenience and necessity which argued for approval of a location for a public utility facility against considerations which called for the enforcement of the zoning regulations. In other words, a zoning commission might find in a given case that the greater public good would be served by locating a public utility structure in a certain place even though it might contravene local zoning regulations. Id., 670; see *Connecticut Co.* v. *New Haven,* 103 Conn. 197, 210, 130 A. 169; *In re Application of Hackensack Water Co.,* 41 N.J. Super. 408, 422, 125 A.2d 281. Upon appeal to the public utilities commission, the same standards apply. This does not mean, as claimed by the plaintiffs, that the circumstances must demonstrate that the site selected and approved is the only available one, or that no other site can be found after an exploration of every possibility, or that the facility can be located nowhere else but on the site in controversy. Suitable alternate sites offer a cogent argument, but the ultimate decision approving one and rejecting others must rest upon a finding that the one approved, tested by the standards heretofore stated, possesses to a reasonable degree advantages over the others under consideration and better satisfies the requirements of public convenience and necessity. *Wenham* v. *Department of Public Utilities,* 333 Mass. 15, 17, 127 N.E.2d 791; *In re Application of Hackensack Water Co.,* supra, 423; see *De Palma* v.

*Town Plan Commission,* 123 Conn. 257, 265, 193 A. 868.

We turn now to the function of the Superior Court upon an appeal allowed under § 5646 and pursued, as it must be, under § 5427. Section 5399 requires that the public utilities commission state the reasons for its decision. The plaintiffs claim that this means, in effect, that the commission shall make a finding of facts. Section 5646 provides, relating to the appeal allowed thereby: "Each . . . order [of the local body] shall be subject to the right of appeal within thirty days from the giving of . . . notice [of its decision] by any party aggrieved to the public utilities commission, which, after rehearing, upon due notice to all parties in interest, shall as speedily as possible determine the matter in question and shall have jurisdiction to affirm or modify or revoke such orders or make any orders in substitution thereof." Section 5427 pertains generally to appeals from the public utilities commission to the Superior Court. This section requires the commission upon an appeal to prepare and file in court a certified copy of "such portions of the record of the case from which such appeal has been taken as may appear to the commission to be pertinent to such appeal, with such additions as may be claimed by any party in interest to be essential thereto . . . . The court, upon such appeal, shall review, upon the record so certified, the proceedings of the commission and examine the question of the legality of the order, authorization or decision appealed from and the propriety or expediency of such order, authorization or decision so far as said court shall have cognizance of such subject and shall proceed thereon in the same manner as upon complaints for equitable relief. If, upon hearing such appeal, it shall appear to the court that any

testimony has been improperly excluded by the commission or that the facts disclosed by the record are insufficient for the equitable disposition of the appeal, it shall refer the case back to the commission to take such evidence as it may direct and report the same to the court, with the commission's findings of fact and conclusions of law." This statute superseded § 3610 of the Revision of 1930 and, like the present form of § 5646, was adopted in 1935. Cum. Sup. 1935, §§ 1414c (g), 1420c.

The plaintiffs lay particular stress upon the sentence of § 5427 last quoted as indicating that the commission must make a finding of facts. We assume that the plaintiffs mean a finding in a form akin to that required in appeals from trial courts to this court under Practice Book § 391. This, say the plaintiffs, is essential to a proper judicial interpretation of the action of the commission and a determination of whether it has acted in compliance with law. But the sentence of § 5427 stressed by the plaintiffs must be read in connection with the two sentences preceding it. They require the commission to file in the court pertinent portions of the record, with such additions as may be claimed to be essential by any party in interest, and direct the court to review the proceedings of the commission upon the record so certified. The portion of the statute upon which the plaintiffs rely comes into play only if the court finds that the commission has wrongfully excluded proper evidence or that the facts disclosed by the record are insufficient for the proper disposal of the appeal. In the instant case the court did not so find. It reviewed the finding and order of the commission upon the record which had been certified by the commission to the court for that purpose. Under the statute, it is not the function of the commis-

sion to prepare a "finding" such as is required by the rules upon appeals to this court. It is sufficient if the finding and conclusions of the commission which it calls its "docket" set forth the basic facts upon which it predicates the reasons for its decision, so that the court can determine the basis of the commission's action.

It is true that the finding of the public utilities commission should state with clarity and completeness the facts and conclusions essential to its order. Only in such a case can the court upon review, with the aid of the record certified by the commission under § 5427, properly perform its function. This function is to determine from the record whether the facts found by the commission are supported by the record, whether they furnish justifiable reasons for the action of the commission, and whether it has acted illegally or has exceeded or abused its powers. *Kram* v. *Public Utilities Commission,* 126 Conn. 543, 550, 12 A.2d 775; *Coppola* v. *New York, N.H. & H. R. Co.,* 143 Conn. 109, 112, 119 A.2d 730, and cases cited. These determinations cannot be made unless the finding shows the facts upon which the commission acted and demonstrates the reasons for its conclusions. *Saporiti* v. *Zoning Board of Appeals,* 137 Conn. 478, 483, 78 A.2d 741; see *Colorado-Wyoming Gas Co.* v. *Federal Power Commission,* 324 U.S. 626, 634, 65 S. Ct. 850, 89 L. Ed. 1235; *Executive Television Corporation* v. *Zoning Board of Appeals,* 138 Conn. 452, 455, 85 A.2d 904. While the findings, reasons and conclusions of the commission could have been set forth in better form and more concise language, the finding contains sufficient facts and reasons to support the commission's conclusions. The memorandum of decision filed by the Superior Court reveals that it properly conceived and exer-

cised the functions given to it under the statutes and the decided cases pertaining to such an appeal.

We turn now to consideration of the finding and order of the public utilities commission, its docket so-called, and the court's rulings thereon. We shall detail the essential facts and reasons contained in this docket. Additional steam generating capacity is needed to provide service to the defendant's franchise area in the southwestern part of the state. This conclusion is predicated generally upon a statement of the present generating facilities of the defendant in this state, which are capable of producing 605,350 kilowatts; its over-all need; the distribution of electrical energy from facilities to specified areas; further possibilities for the development of hydroelectric generating facilities; the construction of an additional unit at Devon capable of producing 100,000 kilowatts to supply other areas; and the current increasing demand for electric power. The defendant's dependable capacity fell below the actual peak load in 1954 and 1955. The deficiency was met by the purchase of power from other sources. The new unit at Devon was expected to meet any possible deficiency in 1956, but a progressive deficiency reaching 136,700 kilowatts by 1959 was predicted. There was conflicting testimony on the rate of increase in the demand for electric power, that is, "load growth," in southwestern Connecticut. The defendant's figure, 8.8 per cent annually, was higher than that of the plaintiffs, 6.5 per cent annually. However, three additional generating units of 100,000 kilowatts capacity each were needed in the southwestern area where the defendant has none at present. The defendant asserted that they should be completed by 1964, and the plaintiffs, by 1969. Units of 100,000 kilowatts capacity require from two

and one-half to three years to complete. The commission accepted the defendant's claims as to the time schedule for the construction of these units, that is, one in each of the years 1958, 1961 and 1964.

It is a well-established electrical engineering practice to locate power generating plants as close to the load center as possible. The defendant claimed that Manresa Island is the only available site suitable for the location of additional power generating facilities. This site was selected after an extensive survey. It offers adequate storage area for fuel, good subsurface conditions for construction to carry heavy equipment, large quantities of water for steam generation cooling purposes, a favorable location for low cost fuel delivery, ample space and right of way for the construction of power lines to connect with the transmission system, and proximity to load center. It possesses these characteristics to a higher degree than any other site. Property at Cove Island in Stamford harbor was purchased by the defendant, and application was made to the commission in 1952 for the erection of a steam generating plant there, but the site had to be abandoned because it was condemned by the city of Stamford for recreational purposes. The plaintiffs claimed that a site owned by, and adjacent to, an existing facility of the Connecticut Power Company in Stamford was adequate and could be used to enlarge the generating capacity of the defendant. This site was not acceptable because it was owned by the Connecticut Power Company and was not large enough for further expansion in the foreseeable future, it being possible to add only 300,000 kilowatts generating capacity there. It was not as suitable as the Manresa site. The defendant had considered enlarging the Devon plant but found that it would involve additional and substantial con-

struction costs for transmission lines from Devon to the Norwalk area. Such additional costs can be avoided by use of the Manresa site.

The proposed plant on Manresa Island would be designed to burn either coal or oil. The plans call for an oil burning installation. If coal is used, the conditions imposed by the Norwalk zoning commission on the operation of the plant would be effective to minimize the objectionable features arising from the use of coal. The initial installation on Manresa Island would be a generating unit with a capacity of 100,000 kilowatts, to cost $19,000,000. The plant would be modern in design and construction and appropriately landscaped. Measures would be taken, estimated to be 98 per cent effective, to eliminate smoke and other objectionable features. The commission found that a plant located on Manresa Island would not constitute a nuisance or depreciate property values. While this was a hotly contested issue and much evidence was offered concerning it, there were competent reasons stated in the docket to support the commission's determination. Upon the findings, the commission concluded that the decision of the Norwalk zoning commission should be affirmed, and it denied the plaintiffs' appeal.

The plaintiffs claim that there was no evidence to support a finding that public convenience and necessity required the erection of a generating plant on Manresa Island to supply the defendant's franchise area. They assert that the proof offered was directed to establishing a need for the whole southwest area of the state; that this area differs from the defendant's franchise area in that the latter does not include the city of Stamford and the town of Darien, which are in the franchise area of, and are served by, the Connecticut Power Company; and

that the defendant failed to establish a need for a generating plant on Manresa Island to supply its own franchise area. We are inclined to the view that the evidence could properly be construed by the commission as showing a need for additional generating facilities to meet, safely, the demand in the defendant's specific franchise area. But we need not so decide, for the plaintiffs' argument on this phase of the case is premised upon too narrow an interpretation of the real finding of the commission and the real reason for its decision. It is apparent from a study of the entire docket of the commission, wherein it is stated to be the claim of the defendant that generating facilities are needed to serve its franchise area, that the commission was using "franchise area" as equivalent to "southwest area" in several places. That this is so becomes especially apparent when it is recalled that the application of the defendant to the Norwalk zoning commission referred to the "southwestern area" and specifically mentioned the larger communities located therein, that is, Norwalk, Danbury, Stamford, and Greenwich. The testimony and the exhibits offered by the parties referred to the "southwest area." We construe the finding of the commission to be that public convenience and necessity required the erection of a new generating plant to serve the southwest area. The crucial question posed is whether the commission could base a finding of the need for additional generating facilities on the requirements of a company serving territories outside its specific franchise area. This issue was not raised in *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 103 A.2d 535.

The Superior Court on the present appeal was required to determine what justification the public

utilities commission had for concluding that the defendant was under an obligation to make up any deficiency the Connecticut Power Company might have in supplying electric energy to Stamford and Darien. The defendant is the successor to, and possesses the charter powers of, The Housatonic Power Company and The Rocky River Power Company. 17 Spec. Laws 833; *Connecticut Light & Power Co.* v. *Bennett,* 107 Conn. 587, 590, 141 A. 654. These companies had charter authority to sell and deliver power to other companies outside their respective territories and to enter into contracts for that purpose. 11 Spec. Laws 111, § 2; 15 id. 1093, § 2. Therefore, the defendant was authorized to enter into a contract to sell power to the Connecticut Power Company and so to supply, or help to supply, as the defendant has been doing, the needs in Stamford and Darien. The plaintiffs have cited authorities for the proposition that a demand arising outside of a utility's franchise area is not a consideration of public convenience and necessity so far as that utility is concerned. *Georgia Power Co.* v. *Georgia Public Service Commission,* 211 Ga. 223, 227, 85 S.E.2d 14; *Interstate Commerce Commission* v. *Oregon-Washington R. & Nav. Co.,* 288 U.S. 14, 41, 53 S. Ct. 266, 77 L. Ed. 588; see *High Point* v. *Duke Power Co.,* 34 F. Sup. 339, 343. We do not question this as a general proposition, but the cases cited to support it can be distinguished from the instant case on their facts. In the case at bar, the defendant's charter authority to furnish electric power to other companies for use in their respective franchise areas is, in a real sense, a franchise and, in effect, extends the franchise area of the defendant. But that aside, the power to enter into such a contract is exercised subject to the powers of the public utilities commis-

sion. General Statutes §§ 5656, 5657. We can presume for want of proof to the contrary that the commission has duly considered the matter of the defendant's commitments to the Connecticut Power Company for service to Stamford and Darien, for that is the duty of the commission under the statutes cited. *Adley Express Co.* v. *New Haven,* 129 Conn. 560, 563, 29 A.2d 841. It is inconceivable that the defendant, once committed to such service, could be relieved of it by the commission unless the deficiency was otherwise supplied. Nor can it be said, as a matter of law, that the commission, in order to avoid the construction of a plant on Manresa Island, should order the Connecticut Power Company to build a new plant or allow the defendant to use the Connecticut Power Company site. Presented with this situation, the commission had before it the problem of broad public necessity for a utility service and the means of meeting it, to be weighed against the considerations of local zoning. See *Adams* v. *Greenwich Water Co.,* 138 Conn. 205, 214, 83 A.2d 177.

Furthermore, if only the Stamford load of the Connecticut Power Company was involved, the commission could find that a 30,000 kilowatt unit would be the largest which could be used effectively at the present time and that such an arrangement would result in higher generating costs. On the other hand, taking the southwest area as a unit, it could find that if a 100,000 kilowatt unit was installed and its output absorbed by the interconnected system, over-all economies would result. The estimated cost of installing a 100,000 kilowatt unit is 87 per cent as much per kilowatt as the installation of a 30,000 kilowatt unit. Because of efficiencies possible with the larger unit, it would require only 80 per cent as much fuel per kilowatt hour generated. Therefore, greater

economy to the public would be obtained by a unit with the largest capacity which could be effectively used. Here again, the broad public necessity for a utility service and the means of meeting it most effectively and economically had to be weighed against considerations of local zoning. The defendant having the authority by its charter to sell power to the Connecticut Power Company for use in Stamford and Darien, the commission might well, under a proper petition, require the defendant to supply the power needed. General Statutes § 5410. Furthermore, the commission could find that the pooling of the generating capacities of the four large power companies furnishing electric energy in this state is a distinct advantage because it makes possible the use of large generating units, which operate more economically, in serving the needs of an area which by itself does not require a large unit, and that it is good engineering practice, for emergency and economy, to tie into a single system for the entire state the facilities of each separate company. Upon the facts before the commission, it cannot be said as a matter of law that the court erred in concluding that the commission did not abuse its discretion or act illegally in considering the needs of the entire southwest area under the circumstances and conditions of this case.

The plaintiffs argue that the Manresa Island plant should not be imposed upon Norwalk residents in violation of zoning regulations just because the defendant finds it necessary to supply a deficiency in Stamford and Darien which, on the face of it, the Connecticut Power Company should supply. This argument presupposes, however, that the commission could not expect or require the defendant to supply part of the needs of Stamford and Darien;

even more, that it could not take into consideration the fact that the defendant has been doing so. The argument is not valid for the reasons heretofore stated. Moreover, it is unrealistic. We assume for the purpose of this discussion that the Stamford site of the Connecticut Power Company could be readily acquired. The issue then posed is whether considerations of zoning in Norwalk should result in denying to the defendant the Manresa site and relegate it to the development of a Stamford site owned by another. As to the choice between these alternatives, there was ample evidence before the commission that the Manresa site was superior. It is larger, permitting future development up to 600,000 kilowatts and more storage for fuel, whereas the Stamford site would be limited to a maximum of 300,000 kilowatts. The Manresa site has unlimited amounts of water for cooling purposes, so essential to efficient operation, and offers better subsoil features for construction purposes. Then too, the cost of creating a plant on Manresa Island is somewhat lower, and the efficiency of its operation when completed will be somewhat higher than could be obtained on the Stamford site.

Even if the Stamford site was available, it cannot be said as a matter of law that the commission was arbitrary and unreasonable in approving the Manresa site. But there was no proof offered that the Stamford site was available, and the burden of establishing this fact rested upon the plaintiffs. *Kram* v. *Public Utilities Commission,* 126 Conn. 543, 548, 12 A.2d 775. They argue that since the defendant was seeking the approval of the commission, it should establish that the Stamford site was not available once it was proposed. That might be true if the burden was upon the defendant to prove that

every other available site was considered and that Manresa Island was the only one suitable for the defendant's purposes, but no such burden rested upon it. Rather, the burden was upon the plaintiffs to establish, if they could, that the defendant should be denied the site on Manresa Island because there were other, and superior, sites which could be obtained.

The plaintiffs claim that the action of the commission in rejecting the Stamford site was arbitrary because public convenience and necessity "can require the use of a particular site in violation of zoning only if no other reasonably suitable site is available." Chief Justice Andrews, in *In re Application of Shelton Street Ry. Co.*, 69 Conn. 626, 38 A. 362, in discussing the meaning of "public convenience and necessity," stated (p. 629): "Public necessity . . . is that urgent, immediate public need arising from existing conditions which, in the judgment of the legislature, justifies a disturbance of private rights that otherwise might be legally exempt from such interference. The term is therefore a relative one. It determines, in each case that may arise, the relation of the duty implied in the broad grant of legislative power to promote by appropriate action the interests of the commonwealth, to the limitations of that power established for the protection of private rights. . . . Sometimes . . . the necessity is one which does not affect the whole body politic the same way, but may or may not exist in different localities, for reasons peculiar to each . . . . When [a question of public necessity is] involved it is commonly called a question of 'public convenience and necessity,' or 'common convenience and necessity.'" The term "means a condition existing at the time of the application . . . that, in the judgment of the trier, will justify the interference with private rights in-

volved." Id., 631. Manifestly, it is not necessary that justification for the action of the commission rest upon a finding that there is no alternative. It is enough if, in the deliberate, carefully considered judgment of the commission, the site approved serves the public convenience and necessity better than any alternative offered.

The plaintiffs also claim that the commission erred in rejecting the Stamford site as not being available. They argue that the defendant made no representation as to the availability of this site and point to statements from some of its witnesses that the site was available. At this point the parties raise a question of semantics as to whether the word "available" means "suitable" or "obtainable." This, however, is of little consequence in view of all the testimony relating to the superiority of Manresa Island to the Stamford site. The plaintiffs also claimed that the plant at Devon presently supplying the area could be enlarged. There were valid reasons for rejecting this claim. The Devon plant is located some distance from the load center. It would require the construction of additional costly transmission facilities as well as of additional generating capacity. The overall expense would be substantially more than the cost of a plant on Manresa, and the ultimate cost of producing power for use in the southwest area would be higher per kilowatt hour.

After the finding and order of the public utilities commission was filed, the defendant, although it had stated at the hearings that it intended to use oil firing, announced that it would burn coal. The plaintiffs moved for reargument and the commission denied their motion. They claim that the change subverted the entire finding and conclusions of the commission. The order of the zoning commission which

was appealed to the public utilities commission was predicated upon a representation that coal, and not oil, would be used. That the commission did not base its decisions solely upon the use of oil is clearly indicated by its finding that "if coal has to be used, the conditions incorporated in the order of the Zoning Commission of Norwalk . . . will be effective for the purpose of minimizing objectionable features arising from the use of this fuel." The plaintiffs claim, however, that there was no evidence before the commission to warrant this conclusion. There was considerable testimony concerning the deleterious effects of coal firing, from the matter of dust being blown off the coal in storage to the fly ash emitted by the smoke stack, as well as testimony demonstrating the effectiveness of measures taken to avoid or reduce these hazards to a minimum. The record discloses that this feature was examined at considerable length before the commission. Its denial of the motion for a reargument was properly sustained by the court.

The plaintiffs allege error in the commission's finding that in the years 1957, 1958, and 1959 the defendant expected a progressive deficiency, finally resulting in a shortage of capacity of 136,700 kilowatts in 1959. They claim that this finding was based upon two charts which were improperly admitted in evidence. Apparently the commission assumed that this claim was not pressed. However, administrative agencies are not bound by strict rules of evidence. *International Brotherhood* v. *Commission on Civil Rights,* 140 Conn. 537, 546, 102 A.2d 366; *Norwalk* v. *Connecticut Co.,* 88 Conn. 471, 479, 91 A. 442, and cases cited. The exhibits indicated past and future growth loads, total generating capacity and the deficiency for the defendant's main system from

1954 to 1959. They were prepared by a qualified engineer by applying rates of growth of power consumption for the whole state to the actual experience of the defendant for its main system. They were offered in connection with the sworn testimony of this witness. The plaintiffs had ample opportunity to examine the exhibits, cross-examine the witness, and offer contradictory testimony. The credibility of, and the weight to be given to, this evidence were matters for the commission. *Conley* v. *Board of Education*, 143 Conn. 488, 492, 123 A.2d 747; *Gibson* v. *Connecticut Medical Examining Board*, 141 Conn. 218, 221, 104 A.2d 890. The claim is without merit.

The plaintiffs assert that the commission incorporated in its finding a statement offered by the defendant in another matter before the commission, to the effect that the Manresa site was the most desirable in southwestern Connecticut. Therefore, the plaintiffs say, the commission based its finding of the desirability of the Manresa site upon a statement made in another proceeding before it which was not admissible in the instant case. The proceeding was the one in which the defendant made an application for the erection of a plant on Cove Island, in Stamford Harbor, because the Manresa site was not available at the time. The Cove Island site was lost through condemnation by the city of Stamford. It is a sufficient answer to the plaintiffs' claim to note that there was ample evidence other than the statement complained of to support the commission's conclusion that Manresa Island was the better site.

The plaintiffs also claim that the evidence concerning the operation of the Cos Cob plant of the New York, New Haven and Hartford Railroad Company, as that operation related to smoke nuisance and the depreciation in value of nearby properties, was

improperly received by the commission. This evidence was clearly relevant under the rule stated heretofore concerning evidence before an administrative agency and affords no ground of error. See *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 675, 103 A.2d 535.

The plaintiffs argue that the commission had no power to consider the need for a location to accommodate a greater capacity than 300,000 kilowatts, which was the maximum capacity which could be added at the Stamford site now owned by the Connecticut Power Company. They point to the statement in the commission's docket that Manresa Island can ultimately accommodate 500,000 kilowatts generating capacity, whereas only 300,000 kilowatts were being sought by the defendant, and assert that there is no support in the evidence for a need for anything more. They argue that the possibilities for increasing capacity beyond 300,000 kilowatts should not be a consideration in the selection of a site in this proceeding. An agency such as the commission is, however, under a duty to observe trends over the years in the public demand for power. That a site which offers opportunity for further expansion in the future, beyond that now claimed to be needed, is in respect to that feature preferable to one limited to 300,000 kilowatts is altogether a reasonable consideration. Then too, Manresa Island is presently available. The record indicates a rapid population growth in the southwestern part of the state, and this growth could reasonably be expected to preempt other available sites.

Section 5646, under which the present proceedings were commenced, provides that the order of a zoning commission shall be "in writing and recorded in the records of [the community], and written notice

of any order shall be given to each party affected thereby." The plaintiffs claim a failure of compliance with this provision. The public utilities commission found, in effect, that the order of the zoning commission was contained in the files of that commission in the custody of its secretary. In the absence of any evidence to the contrary, the fact that, upon subpoena, the secretary of the zoning commission produced its records, including the order from which the present appeal was taken, is sufficient warrant for finding that the order was on file in the office of the zoning commission. Being on file there, it was a public record or, in other words, a part of the records of the community. See *State ex rel. Capurso* v. *Flis,* 144 Conn. 473, 482, 133 A.2d 901 (in which we considered the official record of a zoning commission with respect to a petition for a change of zone to be a public record). The public utilities commission also found that a copy of the order of the zoning commission had been served upon the defendant and published in "The Norwalk Hour," a daily newspaper published and circulated in Norwalk. It would be unreasonable to suppose that the legislature, in providing for the giving of written notice of the order of the zoning commission, intended that personal service should be made upon every property owner who might claim to be personally affected. We agree with the public utilities commission in the views expressed by it that personal service, if any is required, need not be made on persons other than the ones under a duty to comply with the order—in this instance, the defendant. For these reasons, the conclusion of the public utilities commission that there had been proper recording, service and notice of the order of the zoning commission under § 5646 was justified. Furthermore, as

the trial court properly ruled, the statutory provision was directory and not mandatory, and any noncompliance with it would not invalidate the order. *Spencer's Appeal,* 78 Conn. 301, 303, 61 A. 1010; *International Brotherhood of Teamsters* v. *Shapiro,* 138 Conn. 57, 67, 82 A.2d 345.

We consider last the claim of the plaintiffs that § 5646 is unconstitutional. They allege that it delegates legislative power to an administrative agency without any legislative standards to guide it. This court passed upon the same claim with respect to legislative delegation of power to the zoning commission in *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 670, 103 A.2d 535. We held the statute constitutional: "In delegating authority to an administrative board, the legislature cannot know or foresee all the possibilities that might arise. The best it can do is to lay down general rules. *Connecticut Co.* v. *Norwalk,* 89 Conn. 528, 531, 94 A. 992; *State* v. *Darazzo,* 97 Conn. 728, 734, 118 A. 81. The challenge of unconstitutional delegation of legislative power is successfully met if the statute declares a legislative policy, establishes primary standards for carrying it out or lays down an intelligible principle to which the agency must conform with a proper regard for the protection of the public interest, and affords a resort to the courts for the protection of both the public interest and private rights. *State* v. *Stoddard,* 126 Conn. 623, 628, 13 A.2d 586; *State* v. *Vachon,* 140 Conn. 478, 482, 101 A.2d 509. The zoning commission was authorized by § 5646 to exercise a police power, and this section, together with the zoning legislation governing Norwalk, furnishes adequate standards to meet constitutional requirements." The standards guiding the public utilities commission are, as stated hereinbefore, the

same as those guiding the zoning commission. Both commissions must balance the standards usually applied by zoning authorities against those applied in the regulation of public utilities in the interest of public convenience and necessity. In the present case, the zoning standards are those contained in the zoning legislation relating to Norwalk. The standards with regard to public utilities are those contained in the legislation pertaining specifically to the public utilities commission and the public utilities under its jurisdiction. These standards have long since been held adequate to meet the test of constitutionality in the respect now urged. *Connecticut Co.* v. *Norwalk,* 89 Conn. 528, 531, 94 A. 992; see General Statutes § 5401; *Connecticut Co.* v. *New Haven,* 103 Conn. 197, 208, 130 A. 169. Section 5646 is constitutional as it applies to the powers given to the public utilities commission.

The Superior Court did not err in dismissing the appeal.

There is no error.

In this opinion the other judges concurred.