## The Briggs Corporation *v.* Public Utilities Commission et al.

Baldwin, C. J., King, Murphy, Shea and Bordon, Js.

Argued June 14—decided September 19, 1961

*Reubin Kaminsky,* for the appellant (plaintiff).

*Louis Weinstein,* assistant attorney general, with whom, on the brief, was *Albert L. Coles,* attorney general, for the appellee (named defendant).

SHEA, J. On May 5, 1960, the plaintiff applied to the defendant commission for authority to transport for hire by motor vehicle, as a contract carrier, petroleum, petroleum products, automobile accessories and other commodities generally sold at gaso-

line service stations. The authority, if granted, would enable the plaintiff to make deliveries from the site of bulk plants and warehouses of Cities Service Oil Company, hereinafter called the shipper, at Portland, Connecticut, to retail outlets for, and consumers of, the shipper's products at all points in Connecticut, and to return refused, rejected and damaged shipments of these commodities from the points of destination to the point of origin. After a public hearing, the commission denied the application. The plaintiff appealed to the Superior Court, which affirmed the action of the commission, and the plaintiff has appealed to us.

Section 16-292 of the General Statutes provides that no motor contract carrier shall operate any motor vehicle for the transportation of property for hire on any highway within this state unless authorized to do so under a permit issued by the public utilities commission. Permits may be issued only after a public hearing. § 16-293. If the applicant is fit, financially responsible and willing and able to perform the service of such a carrier and to conform to the provisions of chapter 285 of the General Statutes, entitled "Motor Carriers of Property for Hire," and the requirements and regulations of the commission thereunder, and if "the proposed operation is not inconsistent with the public interest," he is entitled to a permit. § 16-294. The qualifications of the plaintiff in this case and its willingness to comply with all lawful requirements are not challenged. Therefore, the only remaining question is whether the proposed operation is inconsistent with the public interest. The meaning of the phrase "not inconsistent with the public interest" should be determined in connection with the transportation policy of this state and the relation which the

phrase bears to the statutes which have been enacted to promote that policy.

The General Assembly has declared that the business of motor contract carriers is affected with the public interest and that the safety and welfare of the public upon our highways, the preservation and maintenance of those highways, and the proper regulation of motor common carriers require the regulation of motor contract carriers. § 16-291. A motor contract carrier is defined as any person, not a motor common carrier, who operates motor vehicles over the highways of this state in the transportation of property for hire under special and individual contracts. § 16-281 (d). In contrast, a motor common carrier means any person who operates motor vehicles over our highways in the transportation of property for hire by the general public. § 16-281 (c). A common carrier must obtain from the commission a certificate of public convenience and necessity. § 16-283. A public hearing must be held on any application for such a certificate. § 16-284. In determining whether a certificate shall be granted, the commission is required to consider the existing motor transportation facilities and the effect upon them of granting the certificate; the public need for the service the applicant proposes to render; his suitability and financial responsibility; his ability efficiently to perform the service; the condition of the highways involved and the effect upon them; and the safety of the public using them. § 16-286. A certificate shall not be denied solely on the ground that there is an existing service. Ibid. When no motor common carrier service is being supplied over the route applied for, public convenience and necessity shall be presumed to require the service. Ibid. The commission is au-

thorized to prescribe maximum and minimum rates and to establish by order a division of joint rates when the carriers are unable to agree upon them. § 16-287. Provision is also made against discrimination. § 16-288.

At the time of issuance of a permit to a motor contract carrier, as well as thereafter, the commission has authority to attach conditions to it as the public interest may require. § 16-295. The commission is authorized to prescribe contract carriers' rates and charges covering operations in competition with motor common carriers. In fixing these rates, the commission must not give to a contract carrier which is in competition with a common carrier any advantage or preference which the commission finds to be undue or inconsistent with the public interest. § 16-296. Any contract carrier having five or more contracts shall, prima facie, be construed to be a common carrier. § 16-297.

From this statutory background, it is evident that the transportation policy of this state seeks to promote sound economic conditions in the motor carrier industry. Because a common carrier is required to serve the general public, legal measures have been taken to safeguard and preserve the continuity of that type of service. A common carrier's authority to operate is dependent upon the issuance of a certificate of public convenience and necessity. § 16-283. This means that the benefits to be derived from the operation will not be limited to a few persons in a particular locality. It means benefit to the public generally, and, in the determination of public convenience and necessity, the effect of the commission's action upon the whole public instead of a small part of it must be considered.

The proof which is required to obtain a certificate

of public convenience and necessity is greater and stronger than the proof which is required under § 16-294 to show that a proposed operation "is not inconsistent with the public interest." Brodsky & Lieberman, Interstate Motor Carrier Law, p. 64. In other words, an applicant for a permit to operate as a contract carrier is not required to prove that his proposed operation will serve a useful public purpose, required or demanded by the public; the contract carrier need only prove that his proposed service will not defeat the purposes of our transportation laws. The primary element in the determination of "the public interest," as the words are used in the phrase "not inconsistent with the public interest," is the maintenance of an adequate transportation system designed to meet the needs of the public. Consideration must also be given to the safety and welfare of the public, the maintenance of our highways, and the proper regulation of carriers. Perhaps some individual shipper will find it more convenient to engage a contract carrier to handle a particular type of transportation. This test should not be conclusive. The mere desire of a shipper to engage the services of a particular person as a contract carrier would not, standing alone, justify the granting of a permit or be consistent with the public policy of the state. *William Heim Cartage Co., Extension of Operations–Indianapolis,* 20 M.C.C. 329, 331. The burden is upon the applicant for a permit as a contract carrier to show that facilities of existing carriers serving the territory in question are inadequate, or that existing carriers are not rendering a type of service which satisfies the needs of the public and that the proposed service would tend to correct or substantially improve that condition. Ibid. If a contract carrier takes business

away from common carriers, the result may so reduce their income that they will be unable to maintain adequate and efficient common carrier service for the public. Such a change would not be in the public interest. Beyond the curtailment of service, the diversion of selected traffic may even cause losses so heavy as to necessitate abandonment of facilities on which the life of a community depends. The petroleum traffic is an important factor in supporting common carrier operations. If these operations are to be continued, they must not be imperiled by diversion to contract carriers. *Worm Extension of Operation–Ainsworth and Johnstown, Neb.*, 32 M.C.C. 641, 644. The legislature saw the wisdom and necessity of making provision for contract carriers. In doing so, however, it took precautions to ensure the continuance of a sound and efficient common carrier service by guarding against unfair or destructive competition.

The evidence material to the decision of the commission was as follows: Prior to January, 1960, the Valley Oil Company, hereinafter called Valley, operated a petroleum business with storage facilities at Portland. As a private carrier, it transported petroleum products in its own trucks to gasoline stations owned by it and others in various places in this state. In January, 1960, Valley sold its gasoline stations, distributing business and storage facilities to the shipper. The plaintiff acquired the Valley fuel oil business and is now a tenant of the shipper at the latter's bulk storage locations. The plaintiff is engaged in the business of distributing fuel oils and heating equipment and proposes to supply, for hire, transportation service to the shipper by using equipment which it acquired from Valley. This equipment consists of a tractor-trailer

unit with a capacity of 6200 gallons and containing three separate compartments; a tank truck with a capacity of 2900 gallons and containing three compartments; and another truck with a capacity of 2700 gallons and containing four compartments. All of these vehicles are equipped with meters and have compartments below the tanks for the transportation of oil, tires, batteries and accessories. A stake body truck is also available for the delivery of oil and accessories when no tank deliveries are being made. The trucks and equipment would be lettered in accordance with specifications of the shipper. It is estimated that the bulk liquid traffic, including gasoline and diesel fuel, would amount to about six million gallons a year. The rates to be charged for transportation would conform to the requirements of the commission. The plaintiff is obligated by contract to purchase all of its fuel oil from the shipper for a number of years. The plaintiff would limit the hire of its vehicles to the service of the shipper.

Since January, 1960, the shipper has employed the services of a common carrier to make bulk deliveries of its products. The equipment used by this common carrier has been leased to it by the shipper. Accessories and the other incidental items have been transported by general commodity motor common carriers. The shipper claimed that it would be a matter of great convenience to be able to transport gasoline and automobile accessories in the same vehicle. The shipper prefers a contract carrier to a common carrier because the former would become a "house organ" under the direct control of the shipper, in contrast to a common carrier, whose facilities must be available to the public in general. In addition, the shipper also claimed that the con-

tract carrier service would be beneficial to it because of the plaintiff's proximity to the bulk plant, its familiarity with the type of service required, the association of its personnel with the customers involved, the freedom from entanglements with other customers and the concentration of all deliveries, bulk as well as packaged commodities, in one carrier with the shipper's name on its equipment.

Five common carriers and one contract carrier appeared in opposition to the plaintiff's application. Of these, one common carrier had full authority from the commission to transport all of the products and commodities to all of the destination points and was prepared to perform the service. The four remaining common carriers had authority to engage in bulk liquid transportation, which is the primary object of the plaintiff's application. These four have large tank trucks, and three of them testified to a willingness to acquire the type of equipment necessary to service the shipper's needs. Two expressed a willingness to apply to the commission, if necessary, for additional authority to transport the accessories and incidental items.

The commission could properly find, as it did, that the available common carrier service was adequate to meet the transportation needs of the shipper. This was true even though every precise requirement of the shipper could not be met immediately. The commission could also find that the proposed contract carrier service would supplant rather than supplement the existing common carrier service and that it would have an adverse effect on common carriers.

The commission concluded that the proposed operation would be inconsistent with the public interest and denied the plaintiff's application.

The Superior Court, upon appeal from an order of the commission, does not retry the case. The only question before the court is whether the commission acted illegally or exceeded or abused its powers. *Greenwich* v. *Greenwich Water Co.,* 145 Conn. 526, 533, 144 A.2d 318; *Coppola* v. *New York, N.H. & H.R. Co.,* 143 Conn. 109, 112, 119 A.2d 730. The burden of showing that the commission acted illegally or in excess of its authority was on the plaintiff. *Brook Ledge, Inc.* v. *Public Utilities Commission,* 145 Conn. 617, 619, 145 A.2d 590; *Greenwich* v. *Greenwich Water Co.,* supra; *Kram* v. *Public Utilities Commission,* 126 Conn. 543, 548, 12 A.2d 775. A conclusion of the commission not legally supported by the evidence would constitute an abuse of its powers. The weight of the evidence, however, as well as matters of credibility, is within the province of the commission. *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 264, 140 A.2d 874.

We cannot say that the commission was not justified in reaching the conclusion it did. There was evidence to support its findings, and the weight to be given to the evidence was for it to decide. It was required to consider not only the needs of the individual shipper but also the effect of the proposed operations on the public interest in all aspects which related to the problem. Even if the commission found that private interests would be promoted by the issuance of the permit, the commission would be justified in concluding that those interests must be subordinated to the larger public interest. Under all the circumstances, the trial court did not err in concluding that the plaintiff had not sustained the burden of proving that the commission acted illegally or in excess of its authority.

One other claim merits our attention. The plaintiff contends that the commission imposed upon it the burden of proving that its services would "supplement and not supplant" those of motor common carriers. The plaintiff correctly points out that such a requirement, if imposed by the commission, would create an additional standard or burden which was not intended by the legislature. The finding in this case makes reference to a former decision of the commission containing language similar to the phrase under attack here. A reading of the language quoted from that decision clearly demonstrates that the commission did not limit its considerations there to the viewpoint of the common carrier alone. Nor could the commission legally confine its inquiry within such narrow limits. In the determination of what may be inconsistent with the public interest in a given case, no general rule, applicable to every situation, can be established. Each case must be decided in the light of its own particular circumstances. Although the commission may investigate the facts to ascertain whether the services of a motor common carrier would be supplanted rather than supplemented by the proposed services of a contract carrier, the result of its investigation should not, and could not, furnish a conclusive answer to the question whether the proposed operation would be inconsistent with the public interest. The finding here, taken in its entirety, clearly shows that the failure of the plaintiff to prove that its services would merely supplement, rather than supplant, the services of motor common carriers, although a consideration in the decision of the commission, was not the sole consideration. The commission did not impose an improper burden on the plaintiff.

We find nothing here to indicate that the commission acted illegally or in excess of its authority.

There is no error.

In this opinion BALDWIN, C. J., KING and BORDON, Js., concurred.

MURPHY, J. (dissenting). In the second paragraph of the majority opinion, it is conceded that the plaintiff met all of the formal requirements of General Statutes § 16-294 for the granting of a motor contract carrier's permit and that "the only remaining question is whether the proposed operation is inconsistent with the public interest." I have studied the opinion, as well as the finding of the commission, and fail to ascertain from either that the interest of the general public would be affected in the slightest degree if the permit were issued.

The majority opinion states that one of the common carriers who opposed the plaintiff's application had the necessary certificates to transport the shipper's products and was prepared to do so. While that carrier had the certificates, its president admitted on cross-examination that it did not have the equipment which was needed to service the shipper's needs. It lacked meters, flow lines and tanks. Four other carriers had certificates for petroleum transportation but not for general commodities. At least three were willing to take on the business if the contract was of sufficient duration to warrant the investment in the necessary equipment. In other words, the common carriers were willing, but not one of them was able, to handle the business at the time of the hearing.

The majority opinion, near the end, states that the plaintiff contends that the commission imposed upon it the burden of proving that its services

would "supplement and not supplant" those of motor common carriers and then proceeds to say that such a requirement would be contrary to the standards set by the legislature. That the commission imposed such an arbitrary burden on the plaintiff is evident in its finding, which states: "An applicant for Commission authority to provide motor contract carrier service has the burden of proof to demonstrate that the service which it proposes to render will supplement and not supplant that of motor common carriage. We have stated repeatedly that 'an existing common carrier service should not be supplanted by the service of a motor contract carrier, which, under the statutes, appears to fill the role of supplementing rather than supplanting common carrier service, unless the needs of the shipper cannot be reasonably met by common carrier service.' See Commission Finding in Application 8031, dated January 21, 1946, *In the Matter of the Application of John F. and Frederick P. Mahr.* Upon consideration of all the evidence, we are of the opinion that the available common carrier service is adequate to meet the transportation needs outlined in this proceeding. Accordingly, we find that the proposed contract carrier service would supplant rather than supplement existing common carrier service, and would have an adverse effect on common carriage, and would be inconsistent with the public interest. We find, therefore, that the application should be and it hereby is denied."

The trial court, in its memorandum of decision, stated that the commission denied the plaintiff a permit for contract carriage because it would supplant common carriage and thus be inconsistent with the public interest. As none of the opposing carriers had the necessary equipment as well as the

required certificates of authority, I fail to see how the granting of the permit would supplant something that did not exist. Even the carrier which had been making the bulk deliveries for the shipper since January, 1960, had to lease equipment from the shipper in order to do the work. It is significant to note that of the three authorities on carrier operation cited in the majority opinion, one is a textbook and the others are not the decisions of a court but of a commission. I find it difficult to reconcile the statements in the paragraph of the opinion in which these authorities are cited which at first says that "an applicant for a permit to operate as a contract carrier is not required to prove that his proposed operation will serve a useful public purpose, required or demanded by the public," and then later on says that he must prove "that existing carriers are not rendering a type of service which satisfies the needs of the public and that the proposed service would tend to correct or substantially improve that condition."

The finding of the commission is destitute of any facts. It attempts to summarize testimony and does not state the facts found from the evidence. Other than documents submitted by the plaintiff, the record consists of the transcript of the evidence before the examiner who conducted the hearing. It does not include the report of the examiner and his associates to the commission or any recommendations made therein. Nor does it contain any reference to the action of the commission in connection with the examiner's report. As the transcript does not indicate that any of the members of the commission participated in the hearing upon this application but rather that the hearing was conducted by members of the commission's staff, who are re-

quired by General Statutes § 16-8 to make a report to the commission, it seems strange that the finding of the commission makes no mention of the personnel who conducted the hearing or of any report filed by them. In *Waterford* v. *Connecticut State Board of Education,* 148 Conn. 238, 246, 249, 169 A.2d 891, where an examiner conducted the hearing and reported to the board, the Superior Court and this court had the benefit of the examiner's report in determining whether the board had acted illegally or arbitrarily. Such a report is pertinent to the appeal in this case and should have been filed in court for proper consideration in the equitable disposition of the appeal.

The only interest which would have been affected by the granting of the permit was the interest of certain common carriers in acquiring the business of transporting the shipper's products. By no stretch of the imagination could it be said that the interest of the general public would suffer. Public interest means something in which the public, the community at large, has some pecuniary interest, or some interest by which its legal rights or liabilities are affected. *State ex rel. Glenn* v. *Crockett,* 86 Okla. 124, 126, 206 P. 816. The term "public interest" has application to the interests of the public as a whole and not to the private interests of competitors. *In re Application of Paulson,* 249 Minn. 236, 245, 81 N.W.2d 875. Fear that the granting of a motor contract carrier permit might undermine common carriage is pure speculation and is unsupported by the record in this case.

Either the action of the commission should be reversed on the record before us or the case should be remanded to the trial court with direction to refer it back to the commission for submission of

a proper record in conformity with the provisions of General Statutes § 16-37. *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.,* 145 Conn. 243, 252, 140 A.2d 874.