*334 Chief Justice Roberts
delivered the opinion of the Court, except as to Part II-D.
“Flow control” ordinances require trash haulers to deliver solid waste to a particular waste processing facility. In C & A Carbone, Inc. v. Clarkstown, 511 U. S. 383 (1994), this Court struck down under the Commerce Clause a flow control ordinance that forced haulers to deliver waste to a particular private processing facility. In this case, we face flow control ordinances quite similar to the one invalidated in Carbone. The only salient difference is that the laws at issue here require haulers to bring waste to facilities owned and operated by a state-created public benefit corporation. We find this difference constitutionally significant. Disposing of trash has been a traditional government activity for years, and laws that favor the government in such areas— but treat every private business, whether in-state or out-of-state, exactly the same — do not discriminate against interstate commerce for purposes of the Commerce Clause. Applying the Commerce Clause test reserved for regulations that do not discriminate against interstate commerce, we uphold these ordinances because any incidental burden they may have on interstate commerce does not outweigh the benefits they confer on the citizens of Oneida and Herkimer Counties.
I
Located in central New York, Oneida and Herkimer Counties span over 2,600 square miles and are home to about 306,000 residents. Traditionally, each city, town, or village within the Counties has been responsible for disposing of its own waste. Many had relied on local landfills, some in a more environmentally responsible fashion than others.
By the 1980’s, the Counties confronted what they could credibly call a solid waste “‘crisis.’” Brief for Respond *335 ents 4. Many local landfills were operating without permits and in violation of state regulations. Sixteen were ordered to close and remediate the surrounding environment, costing the public tens of millions of dollars. These environmental problems culminated in a federal cleanup action against a landfill in Oneida County; the defendants in that case named over 600 local businesses and several municipalities and school districts as third-party defendants.
The “crisis” extended beyond health and safety concerns. The Counties had an uneasy relationship with local waste management companies, enduring price fixing, pervasive overcharging, and the influence of organized crime. Dramatic price hikes were not uncommon: In 1986, for example, a county contractor doubled its waste disposal rate on six weeks’ notice.
Responding to these problems, the Counties requested and New York’s Legislature and Governor created the Qneida-Herkimer Solid Waste Management Authority (Authority), a public benefit corporation. See N. Y. Pub. Auth. Law Ann. §2049-aa et seq. (West 1995). The Authority is empowered to collect, process, and dispose of solid waste generated in the Counties. § 2049-ee(4). To further the Authority’s governmental and public purposes, the Counties may impose “appropriate and reasonable limitations on competition” by, for instance, adopting “local laws requiring that all solid waste ... be delivered to a specified solid waste management-resource recovery facility.” §2049-tt(3).
In 1989, the Authority and the Counties entered into a Solid Waste Management Agreement, under which the Authority agreed to manage all solid waste within the Counties. Private haulers would remain free to pick up citizens’ trash from the curb, but the Authority would take over the job of processing the trash, sorting it, and sending it off for disposal. To fulfill its part of the bargain, the Authority agreed to purchase and develop facilities for the processing and *336 disposal of solid waste and recyclables generated in the Counties.
The Authority collected “tipping fees” to cover its operating and maintenance costs for these facilities.[1] The tipping fees significantly exceeded those charged for waste removal on the open market, but they allowed the Authority to do more than the average private waste disposer. In addition to landfill transportation and solid waste disposal, the fees enabled the Authority to provide recycling of 33 kinds of materials, as well as composting, household hazardous waste disposal, and a number of other services. If the Authority’s operating costs and debt service were not recouped through tipping fees and other charges, the agreement provided that the Counties would make up the difference.
As described, the agreement had a flaw: Citizens might opt to have their waste hauled to facilities with lower tipping fees. To avoid being stuck with the bill for facilities that citizens voted for but then chose not to use, the Counties enacted “flow control” ordinances requiring that all solid waste generated within the Counties be delivered to the Authority’s processing sites.[2] Private haulers must obtain a *337 permit from the Authority to collect waste in the Counties. Penalties for noncompliance with the ordinances include permit revocation, fines, and imprisonment.
Petitioners are United Haulers Association, Inc., a trade association made up of solid waste management companies, and six haulers that operated in Oneida and Herkimer Counties when this action was filed. In 1995, they sued the Counties and the Authority under 42 U. S. C. § 1983, alleging that the flow control laws violate the Commerce Clause by discriminating against interstate commerce. They submitted evidence that without the flow control laws and the associated $86-per-ton tipping fees, they could dispose of solid waste at out-of-state facilities for between $37 and $55 per ton, including transportation.
The District Court read our decision in Carbone, 511 U. S. 383, as categorically rejecting nearly all flow control laws. The court ruled in the haulers’ favor, enjoining enforcement of the Counties’ laws. The Second Circuit reversed, reasoning that Carbone and our other dormant Commerce Clause precedents allow for a distinction between laws that benefit public as opposed to private facilities. 261 F. 3d 245, 263 (2001). Accordingly, it held that a statute does not discriminate against interstate commerce when it favors local government at the expense of all private industry. The court remanded to let the District Court decide whether the Counties’ ordinances nevertheless placed an incidental burden on interstate commerce, and if so, whether the ordinances’ benefits outweighed that burden.
On remand and after protracted discovery, a Magistrate Judge and the District Court found that the haulers did not show that the ordinances imposed any cognizable burden on interstate commerce. The Second Circuit affirmed, assuming that the laws exacted some toll on interstate commerce, but finding any possible burden “modest” compared to the *338 “clear and substantial” benefits of the ordinances. 438 F. 3d 150, 160 (2006). Because the Sixth Circuit had recently issued a conflicting decision holding that a flow control ordinance favoring a public entity does facially discriminate against interstate commerce, see National Solid Wastes Management Assn. v. Daviess Cty., 434 F. 3d 898 (2006), we granted certiorari, 548 U. S. 941 (2006).
II
A
The Commerce Clause provides that “Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States.” U. S. Const., Art. I, §8, cl. 3. Although the Constitution does not in terms limit the power of States to regulate commerce, we have long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute. See Case of the State Freight Tax, 15 Wall. 232, 279 (1873); Cooley v. Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots, 12 How. 299, 318 (1852).
To determine whether a law violates this so-called “dormant” aspect of the Commerce Clause, we first ask whether it discriminates on its face against interstate commerce. American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm’n, 545 U. S. 429, 433 (2005); Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources, 504 U. S. 353, 359 (1992). In this context, “ ‘discrimination’ simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.” Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore., 511 U. S. 93, 99 (1994); New Energy Co. of Ind. v. Limbach, 486 U. S. 269, 273 (1988). Discriminatory laws motivated by “simple economic protectionism” are subject to a “virtually per se rule of invalidity,” Philadelphia v. New Jersey, 437 U. S. 617, 624 (1978), which can only be overcome by a showing that the State has no *339 other means to advance a legitimate local purpose, Maine v. Taylor, 477 U. S. 131, 138 (1986).
B
Following the lead of the Sixth Circuit in Daviess County, the haulers argue vigorously that the Counties’ ordinances discriminate against interstate commerce under Carbone. In Carbone, the town of Clarkstown, New York, hired a private contractor to build a waste transfer station. According to the terms of the deal, the contractor would operate the facility for five years, charging an above-market tipping fee of $81 per ton; after five years, the town would buy the facility for one dollar. The town guaranteed that the facility would receive a certain volume of trash per year. To make good on its promise, Clarkstown passed a flow control ordinance requiring that all nonhazardous solid waste within the town be deposited at the transfer facility. See 511 U. S., at 387.
This Court struck down the ordinance, holding that it discriminated against interstate commerce by “hoarding] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility.” Id., at 392. The dissent pointed out that all of this Court’s local processing cases involved laws that discriminated in favor of private entities, not public ones. Id., at 411 (opinion of SOUTER, J.). According to the dissent, Clarkstown’s ostensibly private transfer station was “essentially a municipal facility,” id., at 419, and this distinction should have saved Clarkstown’s ordinance because favoring local government is by its nature different from favoring a particular private company. The majority did not comment on the dissent’s public-private distinction.
The parties in this case draw opposite inferences from the majority’s silence. The haulers say it proves that the majority agreed with the dissent’s characterization of the facility, but thought there was no difference under the dormant Commerce Clause between laws favoring private entities and *340 those favoring public ones. The Counties disagree, arguing that the majority studiously avoided the issue because the facility in Carbone was private, and therefore the question whether public facilities may be favored was not properly before the Court.[3]
We believe the latter interpretation of Carbone is correct. As the Second Circuit explained, “in Carbone the Justices were divided over the fact of whether the favored facility was public or private, rather than on the import of that distinction.” 261 F. 3d, at 259 (emphasis in original). The Carbone dissent offered a number of reasons why public entities should be treated differently from private ones under the dormant Commerce Clause. See 511 U. S., at 419-422 (opinion of Souter, J.). It is hard to suppose that the Car-bone majority definitively rejected these arguments without explaining why.
The Carbone majority viewed Clarkstown’s flow control ordinance as “just one more instance of local processing requirements that we long have held invalid.” Id., at 391. It then cited six local processing cases, every one of which involved discrimination in favor of private enterprise.[4] The *341 Court’s own description of the cases acknowledges that the “offending local laws hoard a local resource — be it meat, shrimp, or milk — for the benefit of local businesses that treat it.” Id., at 392 (emphasis added). If the Court were extending this line of local processing cases to cover discrimination in favor of local government, one would expect it to have said so. Cf. United, States v. Burr, 25 F. Cas. 55, 165 (No. 14,693) (CC Va. 1807) (Marshall, C. J.) (“[A]n opinion which is to ... establish a principle never before recognized, should be expressed in plain and explicit terms”).
The Carbone majority stated that “[t]he only conceivable distinction” between the laws in the local processing cases and Clarkstown’s flow control ordinance was that Clarkstown’s ordinance favored a single local business, rather than a group of them. 511 U. S., at 392 (emphasis added). If the Court thought Clarkstown’s processing facility was public, that additional distinction was not merely “conceivable” — it was conceived, and discussed at length, by three Justices in dissent. Carbone cannot be regarded as having decided the public-private question.[5]
*342 c
The flow control ordinances in this case benefit a clearly public facility, while treating all private companies exactly the same. Because the question is now squarely presented on the facts of the case before us, we decide that such flow control ordinances do not discriminate against interstate commerce for purposes of the dormant Commerce Clause.
Compelling reasons justify treating these laws differently from laws favoring particular private businesses over their competitors. “Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities.” General Motors Corp. v. Tracy, 519 U. S. 278, 298 (1997) (footnote omitted). But States and municipalities are not private businesses — far from it. Unlike private enterprise, government is vested with the responsibility of protecting the health, safety, and welfare of its citizens. See Metropolitan Life Ins. Co. v. Massachusetts, 471 U. S. 724, 756 (1985) (“The States traditionally have had great latitude under their police powers to legislate as to the protection of *343 the lives, limbs, health, comfort, and quiet of all persons” (internal quotation marks omitted)). These important responsibilities set state and local government apart from a typical private business. Cf. Tracy, supra, at 313 (Scalia, J., concurring) (“Nothing in this Court’s negative Commerce Clause jurisprudence” compels the conclusion “that private marketers engaged in the sale of natural gas are similarly situated to public utility companies”).
Given these differences, it does not make sense to regard laws favoring local government and laws favoring private industry with equal skepticism. As our local processing cases demonstrate, when a law favors in-state business over out-of-state competition, rigorous scrutiny is appropriate because the law is often the product of “simple economic protectionism.” Wyoming v. Oklahoma, 502 U. S. 437, 454 (1992); Philadelphia v. New Jersey, 437 U. S., at 626-627. Laws favoring local government, by contrast, may be directed toward any number of legitimate goals unrelated to protectionism. Here the flow control ordinances enable the Counties to pursue particular policies with respect to the handling and treatment of waste generated in the Counties, while allocating the costs of those policies on citizens and businesses according to the volume of waste they generate.
The contrary approach of treating public and private entities the same under the dormant Commerce Clause would lead to unprecedented and unbounded interference by the courts with state and local government. The dormant Commerce Clause is not a roving license for federal courts to decide what activities are appropriate for state and local government to undertake, and what activities must be the province of private market competition. In this case, the citizens of Oneida and Herkimer Counties have chosen the government to provide waste management services, with a limited role for the private sector in arranging for transport of waste from the curb to the public facilities. The citizens could *344 have left the entire matter for the private sector, in which case any regulation they undertook could not discriminate against interstate commerce. But it was also open to them to vest responsibility for the matter with their government, and to adopt flow control ordinances to support the government effort. It is not the office of the Commerce Clause to control the decision of the voters on whether government or the private sector should provide waste management services. “The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values.” Maine v. Taylor, 477 U. S., at 151. See Exxon Cory. v. Governor of Maryland, 437 U. S. 117, 127 (1978) (Commerce Clause does not protect “the particular structure or methods of operation” of a market).
We should be particularly hesitant to interfere with the Counties’ efforts under the guise of the Commerce Clause because “[w]aste disposal is both typically and traditionally a local government function.” 261 F. 3d, at 264 (case below) (Calabresi, J., concurring); see USA Recycling, Inc. v. Babylon, 66 F. 3d 1272, 1275 (CA2 1995) (“For ninety years, it has been settled law that garbage collection and disposal is a core function of local government in the United States”); M. Melosi, Garbage in the Cities: Refuse, Reform, and the Environment, 1880-1980, pp. 153-155 (1981). Congress itself has recognized local government’s vital role in waste management, making clear that “collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies.” Resource Conservation and Recovery Act of 1976, 90 Stat. 2797, 42 U. S. C. § 6901(a)(4). The policy of the State of New York favors “displacing] competition with regulation or monopoly public control” in this area. N. Y. Pub. Auth. Law Ann. §2049-tt(3). We may or may not agree with that approach, but *345 nothing in the Commerce Clause vests the responsibility for that policy judgment with the Federal Judiciary.[6]
Finally, it bears mentioning that the most palpable harm imposed by the ordinances — more expensive trash removal— is likely to fall upon the very people who voted for the laws. Our dormant Commerce Clause cases often find discrimination when a State shifts the costs of regulation to other States, because when “the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected.” Southern Pacific Co. v. Arizona ex rel. Sullivan, 325 U. S. 761, 767-768, n. 2 (1945). Here, the citizens and businesses of the Counties bear the costs of the ordinances. There is no reason to step in and hand local businesses a victory they could not obtain through the political process.
We hold that the Counties’ flow control ordinances, which treat in-state private business interests exactly the same as out-of-state ones, do not “discriminate against interstate commerce” for purposes of the dormant Commerce Clause.[7]
*346 D
The Counties’ flow control ordinances are properly analyzed under the test set forth in Pike v. Bruce Church, Inc., 397 U. S. 137, 142 (1970), which is reserved for laws “directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.” Philadelphia v. New Jersey, 437 U. S., at 624. Under the Pike test, we will uphold a nondiscriminatory statute like this one “unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.” 397 U. S., at 142; Northwest Central Pipeline Corp. v. State Corporation Comm’n of Kan., 489 U. S. 493, 525-526 (1989).
After years of discovery, both the Magistrate Judge and the District Court could not detect any disparate impact on out-of-state as opposed to in-state businesses. The Second Circuit alluded to, but did not endorse, a “rather abstract harm” that may exist because “the Counties’ flow control ordinances have removed the waste generated in Oneida and Herkimer Counties from the national marketplace for waste processing services.” 438 F. 3d, at 160. We find it unnecessary to decide whether the ordinances impose any incidental burden on interstate commerce because any arguable burden does not exceed the public benefits of the ordinances.
The ordinances give the Counties a convenient and effective way to finance their integrated package of waste disposal services. While “revenue generation is not a local interest that can justify discrimination against interstate commerce,” Carbone, 511 U. S., at 393 (emphasis added), we think it is a cognizable benefit for purposes of the Pike test.
At the same time, the ordinances are more than financing tools. They increase recycling in at least two ways, confer *347 ring significant health and environmental benefits upon the citizens of the Counties. First, they create enhanced incentives for recycling and proper disposal of other kinds of waste. Solid waste disposal is expensive in OneidaHerkimer, but the Counties accept recyclables and many forms of hazardous waste for free, effectively encouraging their citizens to sort their own trash. Second, by requiring all waste to be deposited at Authority facilities, the Counties have markedly increased their ability to enforce recycling laws. If the haulers could take waste to any disposal site, achieving an equal level of enforcement would be much more costly, if not impossible. For these reasons, any arguable burden the ordinances impose on interstate commerce does not exceed their public benefits.
* * *
The Counties’ ordinances are exercises of the police power in an effort to address waste disposal, a typical and traditional concern of local government. The haulers nevertheless ask us to hold that laws favoring public entities while treating all private businesses the same are subject to an almost per se rule of invalidity, because of asserted discrimination. In the alternative, they maintain that the Counties’ laws cannot survive the more permissive Pike test, because of asserted burdens on commerce. There is a common thread to these arguments: They are invitations to rigorously scrutinize economic legislation passed under the auspices of the police power. There was a time when this Court presumed to make such binding judgments for society, under the guise of interpreting the Due Process Clause. See Lochner v. New York, 198 U. S. 45 (1905). We should not seek to reclaim that ground for judicial supremacy under the banner of the dormant Commerce Clause.
The judgments of the United States Court of Appeals for the Second Circuit are affirmed.

It is so ordered.

 Tipping fees are disposal charges levied against collectors who drop off waste at a processing facility. They are called “tipping” fees because garbage trucks literally tip their back end to dump out the carried waste. As of 1995, haulers in the Counties had to pay tipping fees of at least $86 per ton, a price that ballooned to as much as $172 per ton if a particular load contained more than 25% recyclables.

 Oneida’s flow control ordinance provides in part:
“From the time of placement of solid waste and of recyclables at the roadside or other designated area approved by the County or by the Authority pursuant to contract with the County, or by a person for collection in accordance herewith, such solid waste and recyclables shall be delivered to the appropriate facility, entity or person responsible for disposition designated by the County or by the Authority pursuant to contract with the Authority.” App. to Pet. for Cert. 122a.
The relevant portion of Herkimer’s flow control ordinance is substantially similar:
“After placement of garbage and of recyclable materials at the roadside or other designated area approved by the Legislature by a person for collec *337 tion in accordance herewith, such garbage and recyclable material shall be delivered to the appropriate facility designated by the Legislature, or by the Authority pursuant to contract with the County.” Id., at 135a.

 Each side makes much of the Carbone majority’s various descriptions of the facility. The haulers point out that the Court twice referred to the construction and financing of the transfer station as the town’s project. See 511 U. S., at 387 (“its new facility”), 394 (“its project”); Brief for Petitioners 20-22. The Counties note that the majority referred to the transfer station as a “town-sponsored facility,” Carbone, 511 U. S., at 393, a “favored local operator,” id,., at 389, “the preferred processing facility,” a “single local proprietor,” and a “local business,” id., at 392, but never as a public facility. Brief for Respondents 17, n. 7. The dissent has mined the Carbone decision, appendix, and briefs for further instances of allegedly supportive terminology, post, at 359-360 (opinion of Auto, J.), but we continue to find this duel of labels at best inconclusive.

 See South-Central Timber Development, Inc. v. Wunnicke, 467 U. S. 82 (1984) (invalidating Alaska regulation requiring all Alaskan timber to be processed in-state prior to export); Pike v. Bruce Church, Inc., 397 U. S. 137 (1970) (invalidating application of an Arizona statute to require Arizona-grown cantaloupes to be packaged within the State before ex *341 port); Toomer v. Witsell, 334 U. S. 385 (1948) (invalidating South Carolina statute requiring shrimp fishermen to unload, pack, and stamp their catch before shipping it to another State); Foster-Fountain Packing Co. v. Haydel, 278 U. S. 1 (1928) (invalidating a Louisiana statute prohibiting the export of shrimp unless the heads and hulls had first been removed within the State); Johnson v. Haydel, 278 U. S. 16 (1928) (invalidating analogous Louisiana statute for oysters); Minnesota v. Barber, 136 U. S. 313 (1890) (invalidating Minnesota law requiring any meat sold within the State to be examined by an in-state inspector). Dean Milk Co. v. Madison, 340 U. S. 349 (1951) (invalidating local ordinance requiring all milk sold in the city to be pasteurized within five miles of the city center) — discussed elsewhere in Carbone and in the dissent here, post, at 367-368 — is readily distinguishable on the same ground.

 The dissent asserts that the Court “long ago recognized that the Commerce Clause can be violated by a law that discriminates in favor of a state-owned monopoly.” Post, at 361. The authority it cites — Scott v. Donald, 165 U. S. 58 (1897), and Vance v. W. A Vandercook Co., 170 U. S. 438, 442 (1898) — certainly qualifies as from “long ago,” but does not sup *342 port the proposition. Scott struck down two laws that discriminated in favor of in-state businesses and against out-of-state businesses; neither law favored local government at the expense of all private industry. See 165 U. S., at 92-93,101; Granholm v. Heald, 544 U. S. 460, 478-479 (2005) (describing Scott holding). Scott is simply another case like those cited in footnote 4.
Vance actually upheld, “South Carolina’s monopoly over liquor distribution!;,] ... rejecting] the argument that this monopoly system was unconstitutionally discriminatory.” Granholm, supra, at 507 (Thomas, J., dissenting) (citing Vance, supra, at 450-452). It was the dissent in Vance that argued that “such a state monopoly system constituted unconstitutional discrimination.” Granholm, supra, at 507 (Thomas, J., dissenting) (citing 170 U. S., at 462-468 (opinion of Shiras, J.)). The Vance Court simply struck down a regulation on direct shipments to consumers for personal use, under the Court’s excruciatingly arcane pre-Prohibition precedents. See id., at 455. Most tellingly, Vance harkens back to a bygone era; until the dissent today, it had been dted by this Court in only two cases in the past 60 years.

 Justice Thomas is thus wrong in stating that our approach might suggest “a policy-driven preference for government monopoly over privatization.” Post, at 354 (opinion concurring in judgment). That is instead the preference of the affected locality here. Our opinion simply recognizes that a law favoring a public entity and treating all private entities the same does not discriminate against interstate commerce as does a law favoring local business over all others.

 The Counties and their amicus were asked at oral argument if affirmance would lead to the “Qneida-Herkimer Hamburger Stand,” accompanied by a “flow control” law requiring citizens to purchase their burgers only from the state-owned producer. Tr. of Oral Arg. 33-34 (Counties), 45-46, 49-50 (amicus State of New York). We doubt it. “The existence of major in-state interests adversely affected by [a law] is a powerful safeguard against legislative abuse.” Minnesota v. Clover Leaf Creamery Co., 449 U. S. 456, 473, n. 17 (1981). Recognizing that local government may facilitate a customary and traditional government function such as waste disposal, without running afoul of the Commerce Clause, is hardly *346 a prescription for state control of the economy. In any event, Congress retains authority under the Commerce Clause as written to regulate interstate commerce, whether engaged in by private or public entities. It can use this power, as it has in the past, to limit state use of exclusive franchises. See, e. g., Gibbons v. Ogden, 9 Wheat. 1, 221 (1824).