Justice Stevens,
concurring.
Having dissented in both Reeves, Inc. v. Stake, 447 U. S. 429 (1980), and United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, 550 U. S. 330 (2007), it seems appropriate to state briefly why I would join the Court’s opinion even if those cases had been decided differently. Reeves and United Haulers involved state participation in commercial markets — the market for cement in Reeves and the market for waste disposal in United Haulers. The state entities in those cases imposed burdens on the private market for commercial goods and services. In this case Kentucky and its local governmental units engage in no private trade or business; they are merely borrowers of funds needed to finance public improvements.
Putting to one side cases in which a State may create a “market that did not previously exist,” see Hughes v. Alexandria Scrap Corp., 426 U. S. 794, 815 (1976) (Stevens, J., concurring), I agree with Justice Powell’s view that when a “State enters the private market and operates a commercial *358 enterprise for the advantage of its private citizens, it may not evade the constitutional policy against economic Balkanization.” Reeves, 447 U. S., at 449-450 (dissenting opinion). On the other hand, if a State merely borrows money “to pay for spending on transportation, public safety, education, utilities, and environmental protection,” ante, at 334, it does not “operat[e] a commercial enterprise” for purposes of the dormant Commerce Clause. As the majority of this Court stressed in C & A Carbone, Inc. v. Clarkstown, 511 U. S. 383 (1994) — and Justice Alito reiterated in his dissent in United Haulers — instead of enacting “flow control” waste disposal ordinances, the local governments would have been
“free, of course, to ‘subsidize the[ir] [program] through general taxes or municipal bonds. But having elected to use the open market to earn revenues for’ their waste management program, [they] ‘may not employ discriminatory regulation to give that [program] an advantage over rival businesses from out of State.’” 550 U. S., at 368 (quoting Carbone, 511 U. S., at 394; citation omitted).
A State’s reliance on “general taxes or municipal bonds” to finance public projects does not merit the same Commerce Clause scrutiny as “operating a fee-for-service business enterprise in an area in which there is an established interstate market.” 550 U. S., at 362 (Alito, J., dissenting). I am not persuaded that the Commerce Clause analysis should change just because Kentucky chooses to make the interest it pays on its own municipal bonds, which is already tax exempt under federal law, also tax exempt under Kentucky law.
The citizens of Kentucky provide the natural market for the purchase of Kentucky’s bonds because they are also the beneficiaries of the programs being financed. Moreover, it is their tax payments that will enable Kentucky to pay the interest on the bonds and to discharge its' indebtedness. The tax exemption for Kentucky citizens enhances the marketability of Kentucky bonds in the Kentucky market, moti *359 vating local support for local public improvements. Instead of issuing bonds, Kentucky could have borrowed funds from a Kentucky bank or issued notes to a syndicate of Kentucky lenders without implicating the Commerce Clause, even though such fundraising would preclude an equal amount of money in Kentucky from entering the interstate market for bonds.* Free tickets to the Kentucky Derby for purchasers of the bonds would have a comparable, though presumably lesser, effect. In my judgment state action that motivates the State’s taxpayers to lend money to the State is simply not the sort of “burden” on interstate commerce that is implicated by our dormant Commerce Clause jurisprudence.

Indeed, Kentucky could have just increased taxes. By issuing bonds in lieu of increasing taxes, Kentucky has enlarged the interstate market for securities, as well as increased the money available to Kentucky citizens to partake in this market.