******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STEVE MARTORELLI *v.* DEPARTMENT OF
TRANSPORTATION
(SC 19307)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued January 15—officially released April 28, 2015*

*Michael Feldman*, with whom was *Steve Martorelli*,
self-represented, for the appellant (plaintiff).

*Gregory T. D'Auria*, solicitor general, with whom
were *Charles H. Walsh*, assistant attorney general, and,
on the brief, *George Jepsen*, attorney general, and *Jane
R. Rosenberg*, assistant attorney general, for the appel-
lee (defendant).

*Opinion*

ROGERS, C. J. The primary issue that we must resolve in this appeal is what livery service permit applicants must demonstrate in order to establish that "public convenience and necessity will be improved" by the proposed service pursuant to General Statutes § 13b-103 (a).[1] The plaintiff, Steve Martorelli, appeals from the judgment of the trial court dismissing his appeal and affirming the decision of the defendant, the Department of Transportation (department), denying his application for a livery service permit. On appeal, the plaintiff claims that the trial court improperly affirmed the department's finding that the plaintiff failed to fully satisfy the statutory requirements for obtaining a permit because the department improperly interpreted the "public convenience and necessity" provision of § 13b-103 (a). We agree and, accordingly, reverse the judgment of the trial court in part.

The record sets forth the following undisputed facts and procedural history relevant to our resolution of this appeal. On April 5, 2011, the plaintiff submitted an application to the department for authority to operate two motor vehicles in a new intrastate livery service located in Meriden. In the plaintiff's application, he declared that he would be the sole proprietor of the livery service, and would offer livery services by van and a "super stretch" limousine, both of which had a capacity of ten passengers. The plaintiff also submitted a fiscal analysis balance sheet demonstrating his financial assets, liabilities and capital.

After receiving the plaintiff's application, the department issued notice for a public hearing on the plaintiff's application, which it held on June 28, 2012. A representative of a local limousine service, A Premier Limousine Services, Inc. (Premier), attended the hearing and was granted intervenor party status pursuant to General Statutes § 4-177a.[2] The plaintiff called eight witnesses to testify on his behalf and testified himself as to his financial ability and suitability, his ability to manage a livery service, and his proposed plan to offer lower rates than existing livery services. The plaintiff testified specifically that his services would be less expensive than existing livery services in Meriden and would attract local businesses as customers seeking to transport employees or clients. The department took administrative notice of the plaintiff's proposed rates and Premier's rates.

Following the hearing, the department concluded that the plaintiff did not satisfy his burden of proving the statutory requirement that his livery service would improve present or future public convenience and necessity. The department considered general statutory factors for granting permit applications, including "the suitability of the applicant . . . the financial responsi-

bility of the applicant, the ability of the applicant efficiently and properly to perform the service for which authority is requested and the fitness, willingness and ability of the applicant to conform to the provisions of the statutes and the requirements and regulations of the department thereunder, in accordance with . . . § 13b-103." The department then determined that the plaintiff had sufficient assets to cover his start-up costs and was a suitable applicant based upon his business experience in other business ventures and his clean criminal record. The department found, however, that while the plaintiff "spent a good deal of time attempting to prove the public need for his livery service by pointing out problems he found with [Premier] . . . such [problems] . . . are minor in nature and do nothing to prove a need for the [plaintiff's] service." The department concluded that, "[w]hile it is certainly clear that the [plaintiff] is well liked, the testimony of [his] witnesses falls short [of] proving need and necessity. Few of the witnesses had any real need for a livery service; in fact, taxicab service could have taken care of most of their needs and been far less expensive. Most of these individuals had not called other livery services and had little experience with getting livery service in the [local] area and therefore their lack of experience shed little light onto the livery situation." The department thereafter denied the plaintiff's application based upon his failure to demonstrate that his service would improve public convenience and necessity as required by § 13b-103 (a) (1).

The plaintiff appealed from the department's decision to the trial court, claiming that the department improperly concluded that he failed to establish that public convenience and necessity would be improved by his proposed livery service. He further claimed that § 13b-103 (a) (4), which allows persons who have already held an intrastate livery permit for at least one year to obtain up to two additional vehicle authorizations without a hearing and without written notice of the pendency of the application, violates the equal protection clause of the United States and Connecticut constitutions, the interstate commerce clause of the United States constitution, and the due process clauses of the United States and Connecticut constitutions. The trial court concluded that § 13b-103 was constitutional and that the department properly determined that the plaintiff had failed to demonstrate that public convenience and necessity would be improved by his livery service, and, accordingly, the court affirmed the department's decision and dismissed the plaintiff's appeal. This appeal followed.[3]

On appeal, the plaintiff claims that the trial court improperly: (1) affirmed the department's denial of the plaintiff's livery permit application; (2) found that § 13b-103 (a) (4) did not violate the equal protection clauses of the United States and Connecticut constitutions; (3)

found that § 13b-103 (a) did not violate the interstate commerce clause of the United States constitution; and (4) found that § 13b-103 (a) was not constitutionally void for vagueness in violation of the due process clauses of the United States and Connecticut constitutions. We agree with the plaintiff's first claim but affirm the trial court's judgment on the remaining claims.

I

The plaintiff contends that the evidence he presented of his ability to offer rates lower than those of existing livery service providers satisfied the public convenience and necessity requirement of § 13b-103 (a) (1), and that the department's conclusion to the contrary was "unreasonable and arbitrary . . . ." He also contends that the phrase "public convenience and necessity" is undefined and that the department never explained what facts or evidence would be sufficient to meet this standard. Finally, the plaintiff claims that the department improperly relied on the fact that the plaintiff presented no witnesses who were refused service by existing livery service providers as the sole factor for finding that he failed to satisfy the public convenience and necessity requirement, and that this requirement to show specific, individualized need is wholly inconsistent with *Briggs Corp.* v. *Public Utilities Commission*, 148 Conn. 678, 682, 174 A.2d 529 (1961), wherein this court interpreted public convenience and necessity to mean a "benefit to the public generally, and . . . upon the whole public instead of a small part of it . . . ."

We begin by setting forth the applicable standard of review. "Judicial review of [an administrative agency's] action is governed by the Uniform Administrative Procedure Act [General Statutes § 4-166 et seq.] . . . and the scope of that review is very restricted." (Internal quotation marks omitted.) *Palomba-Bourke* v. *Commissioner of Social Services*, 312 Conn. 196, 202, 92 A.3d 932 (2014) "Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) Id., 203. "[A]n agency's interpretation of a statute is accorded deference when the agency's interpretation has been formally articulated and applied for an extended period of time, and that interpretation is reasonable." (Internal quotation marks omitted.) *Longley* v. *State Employees Retirement Commission*, 284 Conn. 149, 164, 931 A.2d 890 (2007).

The department has not formally articulated its interpretation of the phrase "public convenience and necessity" in § 13b-103 (a) (1) and, in fact, department hearing officers have utilized different standards in prior deci-

sions.[4] Accordingly, the department's interpretation of § 13b-103 is not entitled to special deference. See *Longley* v. *State Employees Retirement Commission*, supra, 284 Conn. 166 (agency interpretation accorded deference when it is "both time-tested and reasonable"). We therefore apply a de novo standard of review. Id. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z[5] directs us first to consider the text of the statute itself and its relationship to other statutes." (Footnote in original; internal quotation marks omitted.) *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 677, 911 A.2d 300 (2006). "When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Gilmore* v. *Pawn King, Inc.*, 313 Conn. 535, 543, 98 A.3d 808 (2014). "We make every effort to construe a statutory scheme as a consistent whole." *Powers* v. *Ulichny*, 185 Conn. 145, 149, 440 A.2d 885 (1981).

We conclude that the phrase "public convenience and necessity" is ambiguous in that it does not establish factors that the department must consider when determining whether an applicant has established that the new service will improve public convenience and necessity. Because the language of § 13b-103 is ambiguous, we may consider its legislative history. The relevant portion of § 13b-103 (then General Statutes § 16-326) was enacted in 1959 to address competition that public service motor vehicle owners faced from livery service carriers.[6] Public Acts 1959, No. 599. In the sparse legislative history on the provision, Senator John F. Pickett, Jr., offered that adding the phrase "public convenience and necessity" was "designed to assist in some small way . . . public transportation operators and owners of this state . . . [in facing] the competition [that] mass transportation system owners receiv[e] from persons operating livery services in competition with our bus lines." 8 S. Proc., Pt. 7, 1959 Sess., p. 3212. The Joint Standing Committee Hearings on transportation provided more insight into the legislature's intent. See Conn. Joint Standing Committee Hearings, Transportation, 1959 Sess., pp. 195–96, remarks of Attorney Reubin Kaminsky. According to Kaminsky, bus and taxi operators whose livelihood depended upon their employment in existing public service carrier companies suffered financial hardship when livery service providers, who

operated their services only periodically or "merely for the purpose of making an extra penny or two," attracted customers away from those companies. Id., p. 196. Frank T. Healey, Jr., of the Connecticut Motor States Association, testified that, while public service providers with regular routes were required to show public convenience and necessity, "[a]nyone today can come . . . even [onto] our very own routes [and] get a livery permit to pick up people that they contract to or otherwise, and we lose the passenger." Id., p. 197.

The legislature's focus was thus on protecting public service carriers such as public bus companies, who were required to demonstrate public convenience and necessity before commencing operations, from competition by incoming livery service providers who previously had not been required to demonstrate that their services would improve or satisfy public convenience and necessity. The legislative history, however, sheds little light on the meaning of that phrase.

Accordingly, we consider the meaning of "public convenience and necessity" as used in a similar statute dealing with motor vehicle carrier services. In *Briggs Corp.* v. *Public Utilities Commission*, supra, 148 Conn. 682, this court interpreted the phrase "public convenience and necessity," as used in General Statutes (1958 Rev.) § 16-283[7] governing common carriers, to mean that "the benefits to be derived from the operation will not be limited to a few persons in a particular locality. It means benefit to the public generally, and, in the determination of public convenience and necessity, the effect of the [Public Utilities Commission's] action upon the *whole public* instead of a small part of it must be considered."[8] (Emphasis added.) Although this interpretation is somewhat general, we are able to glean several points from it. First, while the department's action if it were to deny a permit application will benefit "a few persons in a particular locality"—namely, the existing permittees with whom the applicant would compete if the application were granted—that effect will not, in and of itself, justify the denial. Instead, the department's decision must be based on benefiting the public generally. Second, because there are few, if any, services that *directly* benefit the public as a whole, it is implicit in *Briggs Corp.* that the department may consider the *indirect* benefits to the public as a whole of granting a permit application. In other words, because it is unlikely that any livery service would provide services directly to a significant portion of the state's population, the department may consider the general public interests that would be indirectly advanced by granting an application, including the public's interest in creating efficient and competitive markets. See, e.g., *Atlanta Greyhound Lines of Virginia, Inc.* v. *Silver Fox Lines*, 204 Va. 360, 362, 131 S.E.2d 284 (1963) (considering public convenience and necessity to be improved where permit applicant's service could be readily available to

local public, applicant's service was located locally with equipment readily available, and applicant could meet needs of those desiring service as described "more economically, conveniently and satisfactorily than can the objectors").

We find persuasive the analysis from other states that have reached similar conclusions. The Virginia Supreme Court has recognized that unless the legislature has "established public policy to the contrary, it must be presumed that the emergence of a new, innovative competitor will stimulate existing carriers to serve the public convenience and necessity more efficiently and more economically." *Blanton's Package Delivery, Inc.* v. *Pony Express Courier Corp. of Virginia*, 219 Va. 280, 285, 247 S.E.2d 397 (1978). The court reasoned that public convenience and necessity required consideration of "the effect certification of a new carrier will have upon the public, not the effect it will have upon existing carriers"; (emphasis omitted) id.; and that requiring permit applicants to show that their services would improve public convenience and necessity by demonstrating that existing permit holders are unable or unwilling to serve the public would "equate the vested economic interests of certificated carriers with the necessity and convenience of the public." Id., 286.

The Utah Supreme Court has considered public convenience and necessity through the lens of competition among service providers, reasoning that "competition is almost always an affirmative factor in furthering the public convenience and necessity . . . and . . . diversion of revenue from existing carriers by additional competition is not a valid reason by itself to justify a denial of additional authority." (Internal quotation marks omitted.) *Milne Truck Lines, Inc.* v. *Public Service Commission*, 720 P.2d 1373, 1376–77 (Utah 1986). The court concluded that competition may carry with it benefits "such as the potential beneficial effect upon rates, customer service, the acquisition of equipment more suitable to customer needs, the efficient use of equipment, greater responsiveness in meeting future shipper needs, and greater efficiency in the use of route structures and interlining arrangements." (Internal quotation marks omitted.) Id., 1376.

Finally, the Arkansas Supreme Court has considered the convenience and necessity of the public as distinguished from that of an individual or any number of individuals, and has reasoned that necessity does not require that a service is essential or absolutely indispensable, but only that the service will improve the existing mode of transportation. *Santee* v. *Brady*, 209 Ark. 224, 229, 189 S.W.2d 907 (1945).

Returning to § 13b-103, we find that evidence that is solely directed at demonstrating that an existing livery service will be disserved by the granting of a new permit is not an adequate basis for denial of a permit. Indeed,

§ 13b-103 should be construed to avoid anticompetitive effects to the greatest extent possible, consistent with general legislative policy.[9] *Hartford Bridge Co.* v. *Union Ferry Co.*, 29 Conn. 210, 217 (1860) ("A grant of a monopoly is odious in the eyes of the law making power, and therefore should never be inferred in a legislative grant when not plainly expressed. And it is equally odious, in modern times, in the eyes of the courts. It is regarded as an act of improvident legislation." [Internal quotation marks omitted.]).

On the basis of the foregoing, we conclude that, in determining whether it should grant an application for a livery service permit, the department should consider whether a permit applicant has provided evidence on whether the service will benefit the relevant class of users and whether the proposed service is more efficient, more economical, more convenient, more satisfactory, or different than the services offered by existing service providers; see *Blanton's Package Delivery, Inc.* v. *Pony Express Courier Corp. of Virginia*, supra, 219 Va. 285; *Atlanta Greyhound Lines of Virginia, Inc.* v. *Silver Fox Lines*, supra, 204 Va. 362; whether the new service would create a potentially beneficial effect upon rates and customer service and whether the acquisition of equipment would be more suitable to customer needs; see *Milne Truck Lines, Inc.* v. *Public Service Commission*, supra, 720 P.2d 1376–77; whether the population in the area that the applicant proposes to service is increasing and whether potential customers have requested a service like that suggested by the applicant; see *Almeida Bus Lines, Inc.* v. *Dept. of Public Utilities*, 348 Mass. 331, 342–43, 203 N.E.2d 556 (1965); and whether the proposed service will improve the existing mode of transportation. See *Santee* v. *Brady*, supra, 209 Ark. 229.

With this framework in mind, we turn now to the present case. It is clear that the department did not apply the proper standard, instead stating conclusorily that the plaintiff had failed to present witnesses who had experienced difficulty obtaining livery services from other service providers and thus he did not prove "need and necessity." In affirming the department's decision, the trial court also used an improper standard when it found that the phrase "public necessity" is "an actual need or a need that will likely occur within the immediate or reasonably foreseeable future."[10] Because neither the department nor the trial court applied the proper standard, we reverse the trial court's judgment upholding the department's finding that the plaintiff failed to establish that his service would improve public convenience and necessity, and we conclude that this case must be remanded to the department for a new hearing at which it should apply the proper standard as articulated in this opinion.

II

We next address the plaintiff's argument that § 13b-103 (a) (4) violates the equal protection clauses of the United States and Connecticut constitutions. The plaintiff contends that the statute unreasonably favors existing permittees, who may obtain up to two additional vehicle authorizations without proving "public necessity and convenience" at a departmental hearing, and irrationally discriminates against suitable first time applicants such as the plaintiff. We disagree.

"Article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, provides: No person shall be denied the equal protection of the law . . . . As a general matter, this court has interpreted the state constitution's equal protection clause to have a like meaning and [to] impose similar constitutional limitations as the federal equal protection clause. . . . To prevail on an equal protection claim, a plaintiff first must establish that the state is affording different treatment to similarly situated groups of individuals." (Citations omitted; internal quotation marks omitted.) *Markley* v. *Dept. of Public Utility Control*, 301 Conn. 56, 68, 23 A.3d 668 (2011) "Legislative classifications that are not drawn along suspect lines and that do not burden fundamental rights are reviewed under the deferential rational basis standard. . . . Under rational basis review, the [e]qual [p]rotection [c]lause is satisfied [as] long as there is a plausible policy reason for the classification . . . the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational . . . . Further, [equal protection] does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification. . . . [I]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature. . . . To succeed, the party challenging the legislation must negative every conceivable basis which might support it . . . ." (Internal quotation marks omitted.) Id., 69–70.

As we now construe "public convenience and necessity," a new applicant need only show that the service meets the standard set forth in part I of this opinion. Even though an existing permittee can add new vehicles without applying for a permit, the burden on new applicants is relatively light and the classification is justified by the need for administrative efficiency. Indeed, the legislature's decision to not require existing permittees, who have already proven suitability and convenience and necessity, to undergo a hearing is rationally related to the goal of easing administrative costs. We thus affirm the trial court's conclusion that § 13b-103 does not vio-

late the equal protection clauses of the United States or Connecticut constitutions.

## III

The plaintiff's third claim is that § 13b-103 violates the dormant commerce clause, or the negative implications of the commerce clause, of article one, § 8, of the United States constitution, by creating barriers to livery service market entry and by protecting existing permittees to the exclusion of new applicants. "To determine whether a law violates [the dormant commerce clause], we first ask whether it discriminates on its face against interstate commerce. . . . In this context, discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. . . . Discriminatory laws motivated by simple economic protectionism are subject to a virtually per se rule of invalidity . . . which can only be overcome by a showing that . . . [there is] no other means to advance a legitimate local purpose . . . ." (Citations omitted; internal quotation marks omitted.) *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330, 338–39, 127 S. Ct. 1786, 167 L. Ed. 2d 655 (2007).

In the present case, § 13b-103 applies to all in-state and out-of-state livery service providers. The plaintiff has offered no evidence of any burden on interstate commerce, save for one witness' offering that he might use the plaintiff's livery service to travel to out-of-state job sites, and the department considered that evidence irrelevant to the plaintiff's intrastate application. We thus reject the plaintiff's claim that the trial court improperly concluded that § 13b-103 does violate the interstate commerce clause.

## IV

The plaintiff's final claim is that § 13b-103 violates the due process clauses of the United States and Connecticut constitutions because the "public convenience and necessity" standard is so ambiguous that it is void for vagueness. We disagree.

This court previously has recognized that "[t]he test of a [statutory standard] is whether the criteria contained in [it] are as reasonably precise as the subject matter requires and are reasonably adequate and sufficient to guide the [agency] and to enable those affected to know their rights and obligations." (Internal quotation marks omitted.) *Ghent* v. *Planning Commission*, 219 Conn. 511, 517–18, 594 A.2d 5 (1991). "A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity." (Internal quotation marks omitted.) *Frank* v. *Dept. of Children & Families*, 312 Conn. 393, 417, 94 A.3d 588 (2014). "If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inher-

ent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . Moreover, an ambiguous statute will be saved from unconstitutional vagueness if the core meaning of the terms at issue may be elucidated from other sources, including other statutes, published or unpublished court opinions in this state or from other jurisdictions, newspaper reports, television programs or other public information . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *DeCiccio*, 315 Conn. 79, 87–88, 105 A.3d 165 (2014).

We conclude that the phrase "public convenience and necessity" set forth in § 13b-103 (a) (1), read in light of the legislative history, related statutes, and existing case law of Connecticut and sister state courts on the subject, provides adequate notice of the factors that the department must consider in determining public convenience and necessity. Accordingly, we affirm the trial court's conclusion that § 13b-103 does not violate the due process clauses of the United States or Connecticut constitutions.

The judgment is reversed only with respect to the dismissal of the plaintiff's appeal from the department's denial of his permit application and the case is remanded to the trial court with direction to remand the case to the department for a new hearing consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

[1] General Statutes § 13b-103 provides in relevant part: "(a) (1) No person, association, limited liability company or corporation shall operate a motor vehicle in livery service until such person, association, limited liability company or corporation has obtained a permit from the Department of Transportation, specifying the nature and extent of the service to be rendered and *certifying that public convenience and necessity will be improved by the operation and conduct of such livery service.* . . . (4) Notwithstanding the provisions of subdivision (1) of this section, the department shall issue to any person who has an intrastate livery permit for at least one year, upon the application of such person, up to two additional vehicle authorizations each year without a hearing and without written notice of the pendency of the application . . . ." (Emphasis added.)

[2] General Statutes § 4-177a (b) provides: "The presiding officer may grant any person status as an intervener in a contested case if that officer finds that: (1) Such person has submitted a written petition to the agency and mailed copies to all parties, at least five days before the date of hearing; and (2) the petition states facts that demonstrate that the petitioner's participation is in the interests of justice and will not impair the orderly conduct of the proceedings."

[3] The plaintiff appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] At the plaintiff's hearing, the department noted only that it would "rather have [the plaintiff] and [his] witnesses testify about the need for [the plaintiff] than to spend a lot of time talking about what [competing, existing permittees] are doing . . . wrong . . . ." The department suggested that the plaintiff could demonstrate public convenience and necessity by presenting "witnesses, who have used [existing livery services] and . . . have had a problem with [those services]," but not through criticizing existing permittees' vehicle conditions and rates, unless "the witness had a rate issue with [existing permittees] . . . ." The department offered that the plaintiff should be "reaching out" to businesses in the state to try to determine whether they might be in need of the plaintiff's services. The department further explained that "[the plaintiff] can prove there's a need for [the plaintiff's services by providing] . . . witnesses that have had difficulty getting ser-

vice," but added that the plaintiff should provide witnesses with "an actual trip experience . . . ."

In prior decisions, the department has determined that livery service applicants would improve public convenience and necessity and thus granted applications where, for example: the permit applicant offered no witnesses to attest to public convenience and necessity; see State of Connecticut, Dept. of Transportation, Final Decision on Application of Friendly Car & Limo Service, LLC (November 3, 2008), available at http://www.ct.gov/dot/lib/dot/documents/dadminlawunit/0712-n-198-l_friendly_car__limo_service_llc.pdf (last visited April 16, 2015); neither of the applicant's witnesses could attest to having trouble obtaining a livery service from existing service providers or to being unhappy with the services they had received, and one witness had not attempted to utilize any prior livery service; see State of Connecticut, Dept. of Transportation, Final Decision on Application of MJ Limousine Service, LLC (September 11, 2007), available at http://www.ct.gov/dot/lib/dot/documents/dadminlawunit/0612-n-126-l.pdf (last visited April 16, 2015); the applicant already held interstate service permits; see State of Connecticut, Dept. of Transportation, Final Decision on Application of A-1 Limousine Service, Inc. (May 1, 2008), available at http://www.ct.gov/dot/lib/dot/documents/dadminlawunit/0710-n-155-l.pdf (last visited April 16, 2015); and where the applicant held an interstate permit and offered one witness who testified that he was a client of the applicant and would like to use the applicant's proposed service for intrastate trips. See State of Connecticut, Dept. of Transportation, Final Decision on Application of A Limo Company, LLC (May 14, 2008), available at http://www.ct.gov/dot/lib/dot/documents/dadminlawunit/0712-n-189-l.pdf (last visited April 16, 2015). On the other hand, the department has also denied an application where the applicant's witness used a livery service several times per year and was once unable to obtain service from existing providers. See State of Connecticut, Dept. of Transportation, Final Decision on Application of Rose City Livery, LLC (March 13, 2009), available at http://www.ct.gov/dot/lib/dot/documents/dadminlawunit/0809-n-154-l_rose_city_livery_llc.pdf (last visited April 16, 2015).

[5] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

[6] General Statutes (1958 Rev.) § 16-1 defines " 'public service motor vehicle' " to include "all motor vehicles used for the transportation of passengers for hire"; while General Statutes (1958 Rev.) § 16-324 defined " 'motor vehicle in livery service' " in part as "every motor vehicle used for the transportation of passengers for hire, except any motor bus and any taxicab operated under a certificate of public convenience and necessity issued by the commission . . . ."

[7] General Statutes (1958 Rev.) § 16-283 provides: "No person shall operate any motor vehicle in the transportation of property for hire as a motor common carrier without first having obtained from the [Public Utilities Commission], after hearing, a certificate of public convenience and necessity to so operate."

[8] The court in *Briggs Corp.* v. *Public Utilities Commission*, supra, 148 Conn. 681, distinguished a "motor common carrier" from a "motor contract carrier": a motor common carrier is required to obtain a certificate of public convenience and necessity and includes "any person who operates motor vehicles . . . [for] transportation of property for hire by the general public"; id; while a "motor contract carrier" is defined as "any person, not a motor common carrier, who operates vehicles over the highways of this state in the transportation of property for hire under special and individual contracts." Id. While the livery service permittees are more closely related to a motor contract carrier because they operate under individual contracts, livery service permittees must, like motor common carriers, demonstrate how their service will improve public convenience and necessity. A motor contract carrier is not required to prove that its proposed operation would benefit public convenience and necessity, but is subject to a less stringent burden that its operation is "not inconsistent with the public interest . . . ." Id., 683.

[9] We acknowledge that the statute was intended to have some inherent anticompetitive effect. See 8 S. Proc., supra, p. 3212, remarks of Senator Pickett. We further recognize that "[i]t is possible . . . that the competitive effect upon existing carriers will be so disabling as to disserve the public interest." (Citations omitted; internal quotation marks omitted.) *Blanton's*

*Package Delivery, Inc.* v. *Pony Express Courier Corp. of Virginia*, supra, 219 Va. 285. We note, however, that the concern expressed in the legislative history was addressed to competition between mass transportation services and livery services as opposed to competition between livery services which is what is at issue in the present case.

[10] The trial court derived this standard from the interpretation of "public convenience and necessity" in *Rudy's Limousine Service, Inc.* v. *Dept. of Transportation*, 78 Conn. App. 80, 97, 826 A.2d 1161 (2003). In that case, the Appellate Court first relied on *Briggs Corp.* v. *Public Utilities Commission*, supra, 148 Conn. 682, to conclude that public necessity is a term that implies a benefit to the public generally. *Rudy's Limousine Service, Inc.* v. *Dept. of Transportation*, supra, 97. The Appellate Court went on, however, to cite as support *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.*, 145 Conn. 243, 261, 140 A.2d 874 (1958), wherein the phrase " 'public convenience and necessity' " was construed as a "relative" term that referred to an " '*immediate* public need . . . .' " (Emphasis added.) This court in *Wilson Point Property Owners Assn.*, which involved electricity generating facilities, drew this language from *In re Application of Shelton Street Railway Co.*, 69 Conn. 626, 629, 38 A. 362 (1897), in which the court considered the public necessity for laying out necessary public highways, a duty charged to municipalities. Id., 630–31; see *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.*, supra, 261. We conclude, however, that the definition of public convenience and necessity as it relates to services upon which our society relies on a daily basis, e.g., roads and electricity, does not apply to a limousine service that, as the plaintiff points out in his reply brief, is a luxury. Unlike the builders of roads, for example, a livery service demands no public taking of private property, and unlike electric utilities, is not a product upon which the public would reasonably be expected to rely on a daily basis. Thus, in the present case, we conclude that the trial court's interpretation of the phrase "public necessity," to the extent that it is based upon the Appellate Court's citation in *Rudy's Limousine Service, Inc.* v. *Dept. of Transportation*, supra, 97, to *Wilson Point Property Owners Assn.*, to be an " 'actual need or a need that will likely occur within the immediate or reasonably foreseeable future,' " was misplaced.